# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| BRIAN PEREZ, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff(s),<br><br>v.<br><br>HIGHER ONE HOLDINGS, INC., MARK VOLCHEK, MILES LASATER, CHRISTOPHER WOLF, JEFFREY WALLACE, DEAN HATTON, and PATRICK McFADDEN,<br><br>Defendants. | **No. 3:14-cv-00755-AWT**<br><br><br>**<u>CLASS ACTION</u>**<br><br>**SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

Lead Plaintiff Brian Perez ("Plaintiff"), along with additional Plaintiff Robert E. Lee (together "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against Defendants, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of Defendants' public statements and publicly available documents, conference calls and announcements, U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Higher One Holdings, Inc., ("Higher One"), analysts' reports and advisories and other press coverage about Higher One, Higher One's stock chart, Higher One's corporate website, data obtained through news services such as Bloomberg, interviews with certain witnesses as discussed herein, and information readily obtainable on the Internet.  Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action brought on behalf of a class consisting of all persons and entities, other than Defendants, their family members and their affiliates, who purchased Higher One Holdings, Inc. (NYSE: ONE) securities from August 7, 2012 to August 6, 2014, inclusive (the "Class Period").  Plaintiffs seek to pursue remedies against Higher One and certain of its officers and/or directors named as Defendants herein for violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      At relevant times, Defendant Higher One was headquartered in New Haven and provided technology-based refund disbursement, payment processing, and data analytics services to higher education institutions and students in the United States, including FDIC-insured online checking accounts, called OneAccounts, and a MasterCard ATM debit card primarily to students.  Higher One served mainly as a middle man, permitting colleges to outsource the administrative task of processing refunds to students of surplus financial aid funds (initially paid directly to the colleges), over and above tuition and costs.  Through its own marketing and websites, Higher One channeled as many of those refunds as possible into its OneAccount bank accounts and provided account holders with its debit card.  It collected fees and charges assessed on the OneAccounts and debit cards – the greater those fees and charges, the more revenue it recorded.  Not a bank itself, however, it had to partner with regulated financial institutions to hold the OneAccount deposits (in exchange for the banks expanding their base of depositors and earning interest on the deposits).  Those partnerships exposed Higher One to extensive regulatory oversight.

3.      Defendants Volchek and Lasater founded Higher One in 2000, took it public in June 2010, and with the other Individual Defendants, oversaw its operations during the Class

Period.  As shown on Appendix A hereto, we now know that, on their watch, ***Higher One <u>never</u> operated in a legally compliant manner as a public company***.

4.      Prior to the Class Period, Higher One had a history of serious legal problems stemming from its deceptive marketing of and improper fees charged on its OneAccount bank accounts and debit cards.  An August 2012 Consent Order, Order for Restitution, And Order to Pay Civil Money Penalty between the Federal Deposit Insurance Corporation ("FDIC") and Higher One (the "2012 FDIC Consent Order"), slammed Higher One for a litany of misconduct in violation of Federal Trade Commission Act ("FTC Act") §5, including charging improper fees on its OneAccount product, from ***July 16, 2008*** to ***August 7, 2012***.  The FDIC hit Higher One with an ***<u>$11 million</u>*** restitution obligation to ***<u>60,000 affected students</u>*** and a $110,000 civil monetary penalty.  It prohibited ***<u>any</u>*** further improprieties in ***<u>any</u>*** Higher One products or services, including without limitation as regards ***<u>any</u>*** consumer fees and ***<u>any</u>*** OneAccount terms, with extensive provisions specifically barring misleading and deceptive marketing and customer communications and requiring compliance with FTC Act §5.  It also imposed a mandatory compliance management system, including a ***written*** compliance program, detailed ***recordkeeping*** obligations, and a robust ***audit*** requirement, while requiring senior management and Board members to receive effective ***training*** and ***written reports*** on the sufficiency of the compliance program and the internal control environment.  The FDIC also required termination of Higher One's then sole-existing bank partner relationship, with The Bancorp Bank ("Bancorp").  Via a separate Consent Order and Order to Pay Civil Monetary Penalty, the FDIC imposed on Bancorp a $172,000 civil monetary penalty, mandatory reforms, and an obligation to state in writing the exact date of termination of the Higher One relationship.

5.      Parallel class action lawsuits filed against Higher One in 2012 also alleged widespread misconduct in violation of state consumer protection statutes, including illegal marketing and improper fees related to its OneAccounts and debit cards, from ***July 1, 2006*** to ***August 2, 2012***.  These lawsuits later settled for ***$15 million*** and a similar commitment to make pertinent reforms.  The multi-year pattern of misconduct was clear and pervasive.

6.      During the Class Period, Defendants made a litany of false and misleading statements that materially misled investors as to the true state of Higher One's legal compliance, its banking relationships, its transparency regarding products, its elimination of exposure to consumer class action litigation, and its results of operations.  Their misstatements and omissions depicted a reformed, growing company that had turned the corner, when in reality, Higher One had merely replaced Bancorp with three successor bank partners and then continued its rampant misconduct.

7.      For instance, in SEC filings and earnings calls during the Class Period, Defendants falsely touted Higher One's compliance with applicable law and the 2012 FDIC Consent Order's mandates and the "excellent progress in working with regulators," while falsely reassuring shareholders that "all material exposure related to this matter has been recorded and we do not expect any further losses as a result of this matter."  In actuality, however, confidential witnesses ("CW"s) observed a very different reality that was undisclosed to investors.  CW4, Higher One's Chief Information Officer, said that Defendant Lasater, who led Higher One's work under the 2012 FDIC Consent Order, wanted to do less, slower, such that Higher One was aiming to do the bare "minimum."  CW5, who was charged with writing Higher One's new banking operations policies and procedures, was given almost no support staff, such that by October 2013 (fourteen months later), ten policies and procedures mandated by the 2012 FDIC

4

Consent Order were still unwritten.  CW5 called Higher One's required compliance program a "joke" and described how its banking department head both refused to alter existing policies when CW5 pointed out problems and told subordinates that Higher One did not have to comply with banking rules and regulations because it was a technology company, not a bank.  CW5 observed that Higher One was slow to rectify misconduct, for instance by delaying refunds of improper overdraft fees so that more fees would be incurred.  CW5 also said that employees were left to learn about new procedures on their own, so that the procedures CW5 wrote were not read by employees, and that no communications were sent by management regarding the 2012 FDIC Consent Order.  CW1, a Vice President ("VP") of Sales, corroborated that no communications had been sent, such that CW1 had no idea what products or practices needed to be changed, and said that employees had been "misled."  CW2, another VP of Sales, said that Higher One senior executives avoided answering questions about the issues raised in the 2012 FDIC Consent Order to such an extent that CW2 wished to leave the company.  Higher One sought to conceal these facts, going so far as to change CW5's title during the Class Period so that CW5 would not talk to FDIC auditors.

8.     As Higher One's misconduct raged, it quietly cost the company one of its banking partner relationships that were so integral to its continued operation.  Specifically, one of its new banking partners, Cole Taylor Bank ("Cole Taylor"), first signed its agreement with Higher One on March 29, 2012, calling for an initial five-year term and automatic three-year renewals thereafter.  Yet, *less than one year later*, on February 12, 2013, Higher One announced that the Cole Taylor agreement had been terminated, effective August 30, 2013.  Defendants, despite discussing the termination extensively and being directly asked by analysts for more details, falsely mischaracterized it as having been "mutual" while otherwise speaking positively of the

Cole Taylor partnership.  Yet, the undisclosed reality was very different.  CW6, a Cole Taylor Senior VP – Compliance Manager whose department was involved in the due diligence concerning Higher One, said that Higher One had agreed to fully indemnify Cole Taylor against any regulator or lawsuit liabilities, which persuaded Cole Taylor to enter into the relationship despite concerns.  CW4 said that mere months after entering into the agreement, and despite that indemnification, *Cole Taylor* began to express concerns over Higher One's business practices.  CW4 said that discussions between Cole Taylor and Higher One as to these concerns continued for between three and six months and involved Defendants Volchek and Lasater.  Thereafter, CW4 said that *Cole Taylor* gave 30- or 60-day notice that they were terminating the relationship, after which *Cole Taylor* terminated the relationship over concerns that it would end up in regulatory trouble related to Higher One's consent agreement or lawsuits.  CW4 said that Cole Taylor had expressed concern, *inter alia*, that Higher One had structured its website to force students to select a Higher One account, a choice that was likely to draw regulator scrutiny.  CW4 agreed that other options besides a Higher One account were "intentionally played down," adding, "I know – I built the website."  CW4 added that the website poorly explained the "hidden fees" charged on One Accounts.  CW said that, after the Cole Taylor relationship termination, Higher One almost went "belly up" before "just barely" replacing it with a successor bank partner, Customers Bank.

9.     Throughout this time period, while making these and other misstatements and omissions as alleged herein, Defendants and other insiders displayed all the hallmarks of a securities fraud.  Taking advantage of the artificial price inflation caused by their fraud, which drove Higher One's stock to a Class Period high of $13.59, they repeatedly amended their Rule 10b5-1 plans, including just days after the Cole Taylor fraud began, for the express purpose –

which Defendants concede – of increasing stock sales.  They engaged in massive insider selling, via a mix of stock options exercises, 10b5-1 plan sales, and sales outside of 10b5-1 plans, pocketing ***tens of millions of dollars*** in ill-gotten gains.  Specifically, Defendants Volchek, Lasater, Hatton and McFadden netted over ***$12.5 million***, while other insiders (including Higher One's Chief Service Officer, who oversaw its relationships with partner banks) netted over ***$34.1 million***.  After cashing out, they ran for the exits, retiring, resigning, or otherwise transitioning out of the company *en masse*.  For instance, by the end of the Class Period, Higher One's co-founders, Defendants Volchek and Lasater, had gone from CEO and Chairman/President/COO, respectively, to part-timers working a few hours a week.  Both left altogether shortly after.

10.    Defendants' fraud was revealed by a series of disclosures in May - August 2014. Collectively, they revealed over time, *inter alia*, that the Federal Reserve's investigation into Higher One's misconduct involving its flagship OneAccount and multiple bank partners was serious enough that it could cost up to $35 million in consumer restitution and risked default on Higher One's credit facility; that Higher One might have to proactively pay an additional $35 million in consumer restitution to consumers with bank accounts at FDIC-regulated bank partners of Higher One; and that Higher One lacks sufficient funds to pay liabilities that high absent additional lending or other drastic fund-raising maneuvers.  The Federal Reserve and Illinois state regulators, which regulate Cole Taylor, levied a Cease and Desist Order aimed at stopping Higher One's "unconscionable" misconduct and "deceptive practices…that, at various points in the financial aid refund selection process, mislead students about the OneAccount," including the ***440,000 OneAccounts*** opened with Cole Taylor between ***May 4, 2012 and August 14, 2013*** and required Cole Taylor to backstop Higher One's restitution obligation for fees collected between ***May 4, 2012 and June 30, 2014***.  This and the other partial corrective

disclosures alleged herein drove Higher One's stock price down from its $6.41 closing price on May 12, 2014 to its $3.71 closing price on August 7, 2014 – *__a 42% decline__*.

11.     Post-Class Period, circumstances continued to deteriorate for Higher One.  On December 23, 2015, the FDIC and the Federal Reserve handed down Orders that imposed on Higher One an aggregate *__$55 million__ restitution obligation to __1,325,000 harmed consumers__* and *__$4.46 million__ in civil monetary penalties*.  These numbers are astonishing.  Higher One's Class Period misconduct affected *__22 times the number of consumers__* that had been at issue in the 2012 FDIC Consent Order and affected roughly *__70% of the total OneAccounts__* open during the Class Period.  The FDIC Orders, involving Higher One and partner bank WEX Bank, covered the time period spanning from *May 4, 2012 through June 15, 2014*.  The Federal Reserve Orders, involving Higher One and partner banks Cole Taylor and Customers Bank, covered the time period spanning from *May 4, 2012 through July 7, 2014*.

12.     Taken together, these Orders described a litany of misconduct by Higher One in violation of FTC Act §5 involving marketing and fees related to OneAccounts and debit cards – the *same misconduct* at issue in the 2012 FDIC Consent Order and 2012 class action lawsuits, as illustrated in Appendix B hereto.  Moreover, the time periods at issue in these Orders overlap with those at issue in the 2012 FDIC Consent Order and the Class Action Settlement, such that it is clear, as depicted on Appendix A hereto, that *Higher One __never__ operated in a legally compliant manner as a public company*.  Higher One ultimately admitted that without the ability to charge improper and illegal fees to OneAccount customers in violation of FTC Act §5, due to heightened regulatory scrutiny, its business model was unsustainable.  After selling off pieces of itself, Higher One was fully acquired in a disadvantageous deal resulting from its substantially weakened position.

13.     As a result of Defendants' wrongful acts and omissions as alleged herein, and the precipitous decline in the market value of Higher One's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

15.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

16.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) as Higher One resides in this District and a significant portion of the Defendants' actions, and the subsequent damages, took place within this District.

17.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

18.     Lead Plaintiff Brian Perez, as set forth in his prior-filed Certification, which is incorporated by reference herein, purchased the common stock of Higher One at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.  Lead Plaintiff Perez resides in New Jersey.

19.     Plaintiff Robert E. Lee, as set forth in his prior-filed Certification, which is incorporated by reference herein, purchased the common stock of Higher One at artificially

inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.  Plaintiff Lee resides in Arizona.

20.     During the Class Period, Defendant Higher One was a Delaware corporation with its principal executive offices located at 105 Munson St, New Haven, CT 06511.  Higher One's common stock traded on the New York Stock Exchange ("NYSE") under the ticker symbol "ONE," with its Class Period stock price rising as high as $13.59.

21.     Defendant Mark Volchek ("Volchek") was a Co-Founder of Higher One in 2000 and, according to his corporate biography, had a major hand in steering Higher One from its first round of seed funding through its IPO in 2010.  He served at all relevant times as Higher One's President and Chief Executive Officer ("CEO") until his being replaced was announced in an 8-K on April 16, 2014 – late in the Class Period.  The timing of this change of role is highly suspicious and strongly supports an inference of scienter, especially when viewed alongside his robust sales of Higher One stock during the alleged fraud and his direct knowledge of the Cole Taylor Fraud (defined below) as alleged herein, as established by CW statements.  At the beginning of the Class Period, his corporate biography as CEO stated that he was at that time "currently responsible for the overall financial management of the company, including financial reporting and investor relations, as well as legal affairs, long-range planning and acquisition strategies."  He holds a bachelor's degree and master's degree in economics from Yale University.

22.     Defendant Miles Lasater ("Lasater") was a Co-Founder of Higher One, and entering the Class Period served as its Chairman, President and Chief Operating Officer.  Prior to founding Higher One, he worked at Walker Digital and as a Silicon Valley consultant.  During the Class Period, at the height of the fraud alleged herein, Defendant Lasater left his position as

Chief Operating Officer, effective May 7, 2013, purportedly to "focus his time and efforts on marketing and product innovation."  Later in the Class Period, in January 2014, he resigned as President, inking an agreement to work part-time, just four days a month, in exchange for salary, performance bonus eligibility, and vesting of outstanding equity awards.  The timing of these changes of roles, as the fraud alleged herein is raging, is highly suspicious and strongly supports an inference of scienter, especially when viewed alongside his robust sales of Higher One stock during the alleged fraud and his direct knowledge of the Legal Compliance Fraud (defined below) and the Cole Taylor Fraud (defined below) as alleged herein, as established by CW statements.

23.     Defendant Christopher Wolf ("Wolf"), beginning in March 5, 2013, and thereafter at relevant times served as Higher One's Chief Financial Officer ("CFO").  Defendant Wolf has considerable relevant experience, as touted in his corporate biography.  With both a bachelor's degree and a master's degree in accounting, he has two decades of experience in executive and senior advisory positions with such companies as Catalina Marketing Corporation and Boulder Brands, Inc.  Prior to joining Higher One, he served as CFO of First Advantage, a privately-held background screening and talent acquisition enterprise.  Before that, he served as Executive VP and CFO of Acxiom Corporation, a publicly-traded, multinational marketing services and information management company with $1.1 billion in revenue.  In January 2014, as the fraud alleged herein was continuing, Defendant Wolf inked a severance agreement that guaranteed himself a full year's salary in the event that he was terminated and thereafter within 24 months either a change of control occurred at Higher One or someone replaced Volchek as CEO.  The timing and terms of this agreement, a defensive measure at the height of the fraud, are highly suspicious and support a strong inference of scienter.

24.     Defendant Jeffrey Wallace ("Wallace") served at all relevant times as Higher One's Vice President of Finance.  As described in his corporate biography at the beginning of the Class Period, Defendant Wallace was "charged with monitoring Higher One's operational risks, leading our external financial reporting and overseeing our business intelligence efforts, … and compliance."  According to his corporate biography, he has considerable relevant experience, including more than 10 years spent at PricewaterhouseCoopers LLP ("PWC"), where he "led client service teams in delivering audit and related services to clients large and small in a variety of industries" and spent two years in PWC's national professional services group "where he worked to develop deep technical expertise."  He holds a bachelor's degree and is a CPA in Connecticut.

25.     Defendant Dean Hatton ("Hatton") served as a Higher One Director from March 2002 through much of the Class Period.  He served as Higher One's President and CEO from 2002 through June 2012 – just before the Class Period.  Entering the Class Period, his Higher One corporate biography made clear his considerable relevant experience, touting his "20 years of diverse general and executive management experience in a variety of industries and organizations ranging from Fortune 50 multi-nationals to entrepreneurial start-ups."  From 2001-2002, he was President and CEO of Yclip, Inc., a direct marketing promotion company that Hatton sold to First Data Corporation.  Prior to that, Hatton served as Executive VP and COO of Carlson Wagonlit Travel, the second largest corporate travel and expense management organization in the world, and Senior VP at Citigroup, where he was CEO of Travelers Property Casualty Direct Response, a Citigroup business unit  that generated over $1 billion in premiums annually.  Before that, Hatton had senior management responsibilities at Great Western Bank (Washington Mutual) and Midlantic National Bank (PNC Bank) in commercial, consumer and

mortgage banking businesses.   Hatton has a B.A. in economics and a graduate banking degree. Defendant Hatton's resignation as a Director was announced in an 8-K on April 16, 2014 – late in the Class Period.  The timing of his resignation is highly suspicious and strongly supports an inference of scienter, especially when viewed alongside his robust sales of Higher One stock during the alleged fraud.

26.     Defendant Patrick McFadden ("McFadden") served as a Higher One Director from 2008 throughout the Class Period, and in that capacity served on its Audit and Compensation Committees.  Mr. McFadden had considerable pertinent experience, including a long tenure, from 1987 to 2010, as non-executive director of UL Holdings Corporation and the United Illuminating Company.  He also served as a director and vice-chairman of the Yale-New Haven Health Services Corporation (since 1984) and as a director of Citizen's Bank of Connecticut in New Haven.  He also held executive positions at the Bank of New Haven, the Connecticut National Bank, and First National Bank.  He held a B.S. in management and a graduate degree in banking.  Mr. McFadden's sales of Higher One stock during the alleged fraud were suspicious and indicative of scienter.  Mr. McFadden is now deceased, and the Court has granted an extension of time to substitute a party under Fed. R. Civ. P. 25(a)(1).  *See* Dkt. No. 84.

27.     Defendants referenced above in ¶¶21-26 are sometimes referred to herein, collectively, as the "Individual Defendants."

28.     Defendant Higher One and the Individual Defendants are referred to herein, collectively, as the "Defendants."

### **NON-PARTY CONFIDENTIAL WITNESSES**

29.     CW1 was a VP of Sales at Higher One from 2006 until 2014.  In 2012 through 2014, CW1 reported to Robert Reach, Higher One's Chief Sales Officer, and to Betsy Burton-

Strunk, its VP of Business Development.  As one of about thirty Vice Presidents at Higher One, CW1 had responsibility for sales to colleges in Higher One's Midwest Region.

30.     CW2 was a VP of Sales at Campus Labs, which Higher One acquired in September 2012.  After the acquisition, CW2 continued to work at Higher One from September 2012 to January 2013.  CW's role was essentially sales representative for the Midwest Region. CW2 reported to John Casey, VP for Business Development at Campus Labs.

31.     CW3 was Higher One's Human Resource Manager between 2011 and October 2013.  Based in New Haven, CW3 reported to Vice President of Human Resources Sharron Gasior, who in turn reported to Defendant Lasater until March 2013 and Defendant Wolf thereafter.  CW3 oversaw staffing and training at Higher One.

32.     CW4 was Higher One's Chief Information Officer from 2010 to March 2014.  In that role, CW4 was responsible for all products, technology and delivery mechanisms that delivered Higher One's products to its customers, and CW4 built, ran, and supported the technical framework that Higher One relied on to serve its customers.  Based in New Haven, CW4 directly reported to Defendant Lasater part of the time and to Defendant Volchek the rest of the time, and regularly communicated with them both.

33.     CW5 was a Compliance Assurance Procedures Analyst at Higher One from August 2011 to October 2013.  Based in New Haven, CW5 reported to Higher One's Director of Compliance Assurance, Mary Mumper, who in turn reported to its VP of Banking, Kathy Clark. CW5 was hired to help Higher One rework its banking and compliance system, and CW5 was one of just four members of the compliance team within Higher One's banking department. CW5 wrote Higher One's new banking operations policies and procedures in the wake of the 2012 FDIC Consent Order.  CW5 was an experienced banking procedures writer, had previously

worked at New Alliance Bank writing procedures, and was confident in understanding industry best practices. Later during the Class Period, CW5's title was changed to Banking Oversight Assurance Analyst, because Higher One wanted to avoid CW5's having contact with FDIC auditors that were scrutinizing Higher One's banking relationships.

34.     CW6 was a Senior VP – Compliance Manager at Cole Taylor Bank from September 2011 to December 2012, who oversaw Cole Taylor's compliance department. Based at its headquarters in Chicago, CW6 reported to the head of its Legal Department. However, CW6 was not hired as a lawyer, was not part of Cole Taylor's legal staff or team, and did not discuss any privileged information.

## SUBSTANTIVE ALLEGATIONS

### Higher One's Business & Operations

35.     During the Class Period, Higher One provided technology-based services on U.S. educational campuses, including educational institution financial aid refund processes and offering students banking services, tuition payment plans, and financial management. Since its founding in 2000, Higher One served more than half of the U.S. higher education market, providing services to over 1,900 campuses and 13 million students nationwide. Higher One's student-targeted products and services included:

(a)     It provided a "Refund Management" line of disbursement services, including OneDisburse® Refund Management®, which were electronic refund management processes purportedly intended to increase efficiency, lower administrative costs, and facilitate distribution of financial aid and other refunds to students, including Refund Management ID, Campus Payroll, PLUS Loan Refund Management, Financial Intelligence, and Accounts Payable Solution. These services put Higher One in place as a middle-man, handling refunds of student loans that were to be paid to students by colleges, once tuition and similar costs were deducted.

(b)     It offered a CASHNET® Payment Solutions and Payment Processing suite of products, such as ePayment to accept online payments; eBill to automate payer billing and processing; and Tuition Payment Plans to personalize students' payment plans.

(c)     It offered products that purportedly facilitated tuition payments and transactions, including Campus Solutions NetPay, providing electronic bill functionality; Campus Solutions Tuition Payment Plans that enabled students to make monthly payments; and Campus Solutions Refunds, which provided a mechanism for schools to disburse funds to students and parents.

(d)     It also provided retail banking services, with respect to which it had to partner with actual banks, including OneAccounts, which were FDIC-insured online deposit accounts for students, as well as faculty, staff, and alumni; OneCard, which is a debit MasterCard® ATM card; and OneAccount Premier and OneAccount Edge for primary account usage.

36.     By funneling student loan proceeds and refunds into its OneAccount products, Higher One grew its customer base and was able to charge its student-customers a litany of improper fees that formed the core of its business model during the Class Period.  The nature of such fees and the lack of disclosure regarding their terms are issues at the core of the fraud alleged herein and ultimately led to a severe crackdown by regulators.

37.     Notably, as a non-bank itself, Higher One had to partner with regulated banks to offer its OneAccount product, serving merely as the consumer interface for purposes of marketing and transaction services, while relying on its bank partners to actually provide the regulated financial products.   Thus, Higher One's relationships with its partner banks were critical on an existential level to its business – without those relationships, it **could not** offer banking services.  However, this arrangement meant scrutiny from the regulators of those banks – whether the FDIC, the Federal Reserve, and/or state authorities, all of which police compliance

with applicable federal and state consumer and lending laws – for **both** Higher One and the specific banks with which it dealt.  Misconduct by Higher One, as occurred both before and during the Class Period alleged herein, would mean not only regulatory fines and penalties for it and its partner bank(s), but also termination by its partner bank(s) of their business relationship with Higher One and correlating damage to Higher One's reputational capital, not only with consumers but also with existing or potential future partner bank(s).

38.     Entering the Class Period, Defendants understood this regime and the risks it posed, having just before been subjected to intense regulatory scrutiny, severe penalties, and new legal duties due to Higher One's pre-Class Period misconduct with its banking products, including by imposition of the 2012 FDIC Consent Order.

### Higher One's Pre-Class Period Misconduct Resulted In Severe Penalties, Costing Millions Of Dollars, And Loss Of A Banking Partner Relationship With Bancorp

39.     Before the Class Period, Higher One was **severely sanctioned** by the FDIC for violations of FTC Act §5, arising from widespread improprieties in its marketing and handling of these financial products.

40.     Specifically, on August 8, 2012, the FDIC issued a press release announcing a settlement with Higher One and its then-existing banking partner, Bancorp, for unfair and deceptive trade practices in violation of §5 of the FTC Act.  Under the settlement, both Higher One and Bancorp agreed to Consent Orders, and Higher One agreed to provide **restitution of** approximately **$11 million** to roughly **60,000 students**.  The FDIC also imposed civil monetary **penalties of $110,000.00** on Higher One.  It also imposed on Bancorp a $172,000 civil monetary penalty, mandatory reforms, and an obligation to state in writing the exact date of termination of the Higher One relationship.  Thus, in addition to the $11 million financial blow, the FDIC penalties cost Higher One its banking partner and caused reputational damage to both of them.

41.     The FDIC's press release stated that it had determined that Higher One operated its student debit card account program (OneAccount) in violation of §5 of the FTC Act, finding, *inter alia*, that Higher One was "charging student account holders multiple nonsufficient fund (NSF) fees from a single merchant transaction; allowing these accounts to remain in overdrawn status over long periods of time, thus allowing NSF fees to continue accruing; and collecting the fees from subsequent deposits to the students' accounts, typically funds for tuition and other college expenses."  As described by the FDIC, the Consent Order required Higher One to change the manner in which it imposed NSF fees, such that it was "required: 1) to not charge NSF fees to accounts that have been in a continuous negative balance for more than 60 days; 2) to not charge more than three NSF fees on any single day to a single account; and 3) to not charge more than one NSF fee with respect to a single automated clearing house (ACH) transaction that is returned unpaid within any 21-day period."  Moreover, Higher One was required not to make misleading or deceptive representations or omissions in its marketing materials or disclosures.  It was also required to "institute a sound compliance management system."

42.     The 17-page 2012 FDIC Consent Order itself stated that the FDIC believed Higher One had engaged in unsafe or unsound banking practices and violations of law and regulation, including unfair and deceptive acts and practices in violation of §5 of the FTC Act, and that Higher One consented to its issuance.  Higher One's misconduct spanned ***July 16, 2008 through August 7, 2012*** – extending back even before it became a public company.  The FDIC's simultaneously-entered Consent Order with Bancorp required written documentation as to the termination of its relationship with Higher One, meaning that Higher One was losing its ***sole bank partner***.

43.     Student-plaintiffs also filed class action lawsuits in 2012 regarding Higher One's alleged violation of consumer protection statutes between *July 1, 2006 through August 2, 2012*, which Higher One later settled by paying $15 million as part of a settlement later announced in November 2013 (the "Class Action Settlement") that required a similar commitment to reforms as those mandated by the FDIC, as discussed *infra*. These plaintiffs alleged that Higher One had engaged in a broad array of misconduct, much of it overlapping with that addressed by the 2012 FDIC Consent Order as shown on Exhibit B hereto, including, *inter alia*:

(a)     Higher One had engaged in extensive deceptive marketing improprieties, including: (i) forcing, or defaulting, consumers into a Higher One account without their consent; (ii) deceptively marketing products by sending unsolicited and "co-branded" debit cards and accompanying materials, falsely implying that the Higher One account was endorsed or required by the consumer's college or university; (iii) intentionally delaying access to financial aid funds for students who chose to use other banking providers besides Higher One's banking partners; (iv) concealing the true costs of its accounts by making incomplete and deceptive disclosures that were difficult to access; (v) requiring students who wished to access their financial aid funds immediately to not opt out of the Higher One account created for them, thus coercing students to remain in the default options and use the Higher One accounts; and (vi) making various misrepresentations and omissions, and foreclosing other banking options, in order to inhibit consumers from opting out of the Higher One account as the default option.

(b)     Higher One had engaged in extensive misconduct regarding fees, including: (i) not making fee information easily accessible to consumers, insofar as the fee schedule was a separate document requiring consumers to click a separate link from the Account Agreement and to read through a page deceptively filled with all the free services offered by Higher One before

finally reaching the fee-based services page, which was not visible on the first screen page and could only be viewed if the student scrolled down to another page on the website; (ii) improperly charging a $29 assessment on Overdraft Fees for accounts used for financial aid funds, including in circumstances where Higher One's systematic approval and debiting of transactions would knowingly turn consumers' Higher One debit cards into credit access devices in violation of federal regulations; (iii) taking in at least $66 million in so-called "convenience fees" charged to students in 2010, a large portion of which were taxpayer funds designated by the federal government for the strict purpose of meeting educational needs for low- and middle-income students; (iv) labelling its card a "debit card" even though the student had to use it as a credit card to avoid the fee and even though some merchants did not permit selecting the "credit card" option, made finding such option difficult at the payment terminal, or gave the option only if the purchase being made was above a minimum amount; and (v) effectively charging two service fees for every non-Higher One withdrawal, including a $2.50 non-Higher-One ATM Transaction Fee in addition to ATM fees charged by owners of the ATMs used, even though students are effectively forced to use out-of-network ATMs because in-network Higher One ATMs are exceedingly rare and are not available to students at all hours, on weekends, or during school vacations or holidays.

44. Thus, Higher One's total pre-Class Period penalties, consumer restitution obligations, and settlements from its extensive, multi-year pre-Class Period misconduct, had cost it a whopping ***$26 million***, a staggering figure (especially when compared to its reported net income (*see, e.g.*, ¶¶108-116 *infra*)) that clearly put Defendants on notice as to the scope and severity of Higher One's misdeeds, the need for *bona fide* reform, and the need to faithfully fulfill the myriad compliance obligations imposed by the 2012 FDIC Consent Order and by FTC

Act §5.  Significantly, ***the pre-Class Period misconduct at issue in the FDIC investigation and the consumer class actions occurred between July 2008 and August 2012***, when Defendants **Volchek** (as co-founder and then-CFO), **Lasater** (as co-founder and then-COO), **Hatton** (as then-CEO), **McFadden** (Director) and **Wallace** (VP of Finance) ***were running the company***.  Thus, the Individual Defendants oversaw Higher One's pre-Class Period misconduct, ensuing regulatory investigations, negotiation of and agreement to the harsh and costly terms of the 2012 FDIC Consent Order and the Class Action Settlement, and the end of Higher One's relationship with its sole banking partner at the time, Bancorp.   To say they were on notice is an understatement.

### **The 2012 FDIC Consent Order Imposed Stringent Legal Obligations On Higher One**

45.    In addition to the payments of ***over $26 million*** stemming from the FDIC action and the consumer class action, as discussed *supra*, the 2012 FDIC Consent Order also spelled out the restrictions, prohibitions, and penalties imposed on Higher One for its misconduct.

46.    2012 FDIC Consent Order ¶1 expressly ***barred future misrepresentations and omissions by Higher One in its marketing materials***, stating:[1]

> (a)    ***Higher One shall not make, or allow to be made, any misleading or deceptive representation, statement, or omission, expressly or by implication, in the marketing materials used to solicit any customer or prospective customer, or in any similar communication, in connection with the OneAccount*** or any consumer or commercial deposit, lending, or other product or service that is or may be offered in conjunction with [the Bancorp Bank] or any "insured depository institution," as that term is defined in 12 U.S.C. § 1813(c)(2) (collectively, "Products and Services").

> (b)    ***Within sixty (60) days*** from the effective date of this ORDER, ***Higher One*** shall take all action necessary to comply with the guidance set forth in Unfair or Deceptive Acts or Practices by State-Chartered Banks (FIL-26-2004, issued March 11, 2004) and ***shall not engage in any violations of Section 5 with***

---

[1]  As used herein, all emphasis within quoted text has been added.

***respect to any Product or Service*** that is or may be offered in conjunction with the Bank or any insured depository institution. Without limiting the generality of the foregoing, ***Higher One shall not make***, and shall cause its service providers not to make, directly or indirectly, ***any misrepresentation***, expressly or by implication, ***about any material term of an offer related to any Product or Service*** that is to be offered in conjunction with the Bank or any insured depository institution in connection with the advertising, marketing, offering, soliciting, extending, billing, or servicing of same, ***including but not limited to misrepresentations and/or omissions as to***:

(i) ***<u>any and all fees</u>***, including non-sufficient funds ("NSF") fees and overdraft fees, and the circumstances under which more than one NSF fee may be charged with respect to a single transaction or item presented multiple times against a OneAccount; or

(ii) ***OneAccount collections, balances, or other OneAccount terms or requirements***.

47.     2012 FDIC Consent Order ¶2 also spelled out Higher One's extensive obligations to create ***a sound risk-based compliance management system*** and ***an effective training program***, stating, *inter alia*:

(a)     ***Within sixty (60) days*** from the effective date of this ORDER, ***Higher One shall review, revise, develop, and/or implement***, as necessary, ***a sound risk-based compliance management system***, including a comprehensive written compliance program ("Compliance Program") ***to ensure that Products and Services comply with consumer protection and fair lending laws, including Section 5***, implementing rules and regulations, and regulatory guidance and statements of policy (collectively "Consumer Protection Laws"). Without limiting the generality of the foregoing, Higher One shall ensure that the Compliance Program includes effective monitoring systems for any such Product or Service with provisions requiring:

(i) review and approval by Higher One and, as applicable, by the Bank or other insured depository institutions of (1) all marketing, advertising, and solicitation materials, including direct mail or internet solicitations, promotional materials, and telemarketing scripts; (2) other materials provided to customers or potential customers generated in connection with the marketing, administration, and servicing of such Product or Service, including agreements, privacy policies, and statements; and (3) any material changes or amendments thereto; and maintenance of copies of the above-described materials by Higher One; …

(v) monitoring by Higher One of the performance of marketing and solicitation programs;

(vi) periodic compliance reviews, including on-site visits as appropriate, by Higher One of partners, vendors, and servicers whose role is material to the Products or Services; …

(vii) maintenance of records by Higher One of all approved Product or Service materials, complaints and responses, customer solicitation materials, administrative materials, and service provider agreements; …

(b)     *Higher One shall ensure that its Compliance Program provides for the establishment and implementation of an effective training program* for appropriate personnel that includes regular, specific, comprehensive training on applicable Consumer Protection Laws for employees having responsibilities that relate to Consumer Protection Laws, including senior management and the Board, commensurate with their individual job functions and duties. …

48.     2012 FDIC Consent Order ¶2 also spelled out *an audit requirement*, to ensure

compliance, stating:

(d) *Higher One shall ensure that its Compliance Program includes a compliance audit component* as necessary *to ensure* an effective and independent review of its internal policies and procedures and *compliance with Consumer Protection Laws* and includes policies, procedures, and processes that ensure:

(i) audit practices and procedures that are consistent with Generally Accepted Auditing Standards, are independent and adequate in scope;

(ii) completion of a compliance audit plan each calendar year that is reviewed and approved by the Board;

(iii) annual risk assessments to ensure that compliance audits are performed with reasonable frequency;

(iv) assignment of ratings or expressions of opinion as to the adequacy, effectiveness, and efficiency of the internal control environment and compliance audit findings, deficiencies, and recommendations relating to a Product or Service, as documented in a written report and provided to the Audit Committee of the Board, with that Committee's review of the written report documented in its minutes, together with a report of the Committee's actions in response to the audit, including where applicable an explanation why a recommendation has not been implemented; and

(v) provisions for an adequate formal tracking and monitoring system for exceptions identified by compliance audits and regulatory examinations.

**Higher One Failed To Comply With The 2012 FDIC Consent Order Obligations**

49.    CW4, Higher One's Chief Information Officer from 2010 to March 2014, was based in New Haven, reported directly to Defendants Volchek and Lasater, and had extensive firsthand  knowledge as to Higher One's efforts – or lack thereof – to comply with the 2012 FDIC Consent Order, which according to CW4, Defendant Lasater led.

50.    CW4 said that Higher One aimed to do the "minimum" as far as complying with the 2012 FDIC Consent Order and satisfying the regulators and added that any changes it made were slow to be implemented.  CW4 said that Defendant Lasater was in charge of implementing changes necessary to comply with the 2012 FDIC Consent Order and decided which changes were made and which were not made.  CW4 said that Lasater wanted to do less, slower.

51.    CW5 was charged with writing Higher One's new banking operations policies and procedures in the wake of the 2012 FDIC Consent Order.  During that effort, CW5 had little support – just a single employee who checked the Customer Identification Program and Bank Secrecy Act.

52.    CW5 called Higher One's compliance program after the 2012 FDIC Consent Order a "joke."  CW5 said that Defendants Volchek and Lasater relied on Higher One's VP of Banking, Kathy Clark ("Clark"), with whom they had meetings, to lead the banking department.  CW5 said, however, that Clark, whose background was a small mid-West bank with a dozen branches, refused to follow new procedures for making banking decisions.  According to CW5, Clark told subordinates that because Higher One was a technology company, not a bank, it did not have to comply with the same rules as banks.  CW5 said that Higher One had the culture of a technology company rather than a bank, and that CW5's colleagues paid little heed to banking regulations.  When CW5 pointed out problems, Clark often refused to alter the existing policy.

53.     CW5 also said that Higher One was slow to rectify its misconduct.  For example, CW5 said that Higher One improperly overdrew customer accounts, leading to a $35 overdraft fee that Higher One was supposed to rebate.  However, Higher One handled the rebates manually and only assigned one person to the task of entering all the manual rebate codes, which that person typically did one day per week, time permitting, instead of processing the rebates immediately.  During the time that person took to enter all the necessary rebates, often upwards of a week, the customer accounts remained in the negative and incurred additional fees.  CW5 said that Higher One made its money primarily through such fees charged to account holders.

54.     CW5 said that Defendants Lasater and Volchek led monthly all-hands-on-deck meetings at Higher One.  CW5 said that Defendant Lasater attended meetings where compliance issues were discussed, during some of which Clark and Higher One's Director of Compliance Assurance, Mary Mumper ("Mumper"), announced that updated policies and procedures could be found online in the Group or community folder, where any finished Banking Operations documents were stored as Word files.  However, CW5 said that while announcements as to compliance issues were made, employees were left to learn about new procedures on their own. CW5 felt that the procedures CW5 wrote were not read by employees.

55.     There is evidence that Higher One specifically sought to conceal these facts from outside scrutiny.  CW5 was hired as a Compliance Assurance Procedures Analyst at Higher One, but CW5's title was changed to Banking Oversight Assurance Analyst because Higher One wanted to avoid having CW5 interact with FDIC auditors investigating Higher One's banking relationships.  This change shielded Higher One from CW5's potentially disclosing to auditors during the Class Period the facts and circumstances of CW5's statement as outlined herein.

56.     CW5 said that ten policies and processes still needed to be written when CW5 was laid off from Higher One in October 2013 – fourteen months after the 2012 FDIC Consent Order was issued.

57.     Higher One's failure to comply with the 2012 FDIC Consent Order through enactment of meaningful reforms and adequate training programs, as discussed by CW4 and CW5, was corroborated by multiple other witnesses, including senior executives, who all said they were not made aware of any reforms, changes to practices, or corrective steps that needed to be taken.

58.     For instance, CW1, who as VP of Sales was one of just thirty Higher One Vice Presidents, said that neither Higher One nor its CEO sent emails or other communications to employees regarding the 2012 FDIC Consent Order or what changes needed to be made to comply with its terms.  CW1 also identified Rob Reach (Higher One's Chief Sales Officer, to whom CW1 reported), Betsy Burton-Strunk (Higher One's VP of Business Development, to whom CW1 reported), and Matt Dorf (Higher One's VP – General Manager of Deposit Solutions) as top managers who would have been responsible for communications with the sales force, but did not make any.  CW1 feels that Higher One "misled employees" because employees were not fully informed of the details of the FDIC settlement.  CW1 personally had no idea what products needed changes or what sales practices needed to be addressed, despite having responsibility for sales to colleges throughout Higher One's Midwest Region.   As for the marketing of Higher One products, CW1 was "not aware of any meaningful changes" made after the 2012 FDIC Consent Order.  CW1 perceived that, instead of delving into the FDIC settlement, most of Higher One's employees were "hoping it would go away and wouldn't be an issue."

59.     Similarly, CW2, who as VP of Sales at Campus Labs (a business Higher One acquired in September 2012) was another of Higher One's Vice Presidents, said that shortly after Campus Labs was acquired by Higher One, all Campus Labs salesmen met at Higher One's corporate headquarters for a multi-day orientation, during which Defendant Volchek and Higher One's CFO told the salesmen about the FDIC problems but did not go into much detail or tell the group what to do to address the problems.   CW2 added that Robert Reach gave a long presentation to the salesmen, but when he was asked about the issues raised by the FDIC, Reach evaded answering.   CW2 said that, at that moment, he knew he did not want to continue working for Higher One.

60.     CW3, who was Higher One's Human Resources Manager during the Class Period and oversaw its staffing and training, likewise did not recall any communications from management as to the 2012 FDIC Consent Order.   CW3 observed that Defendant Wolf was "very involved" in Higher One's day-to-day operations and exerted new oversight of human resources that had not existed prior to his tenure.   During CW3's tenure at Higher One, CW3 discovered "a lot of complaints" by students about Higher One debit cards, including hidden fees, while doing independent research and became increasingly concerned about Higher One's legal and ethical footing.   CW3 learned of the FDIC settlement during a quarterly meeting in spring 2012, at which Defendant Volchek said that FDIC regulators would be visiting Higher One's New Haven offices and that "we didn't follow the proper compliance."   At that time, CW3 was told that Higher One intended to make marketing language more transparent, but, despite the fact that CW3 was in charge of training generally at Higher One, that was the only communication CW3 could recall from management directly related to Higher One's failure to follow regulatory protocol.

27

61. These CW statements make clear that Higher One failed to comply with its extensive obligations imposed under the 2012 FDIC Consent Order.

## Higher One's Successor Bank Partner Cole Taylor
### Terminated Its Relationship With Higher One

62. CW5 said that in the wake of the 2012 FDIC Consent Order, Higher One was having trouble finding bank partners. CW5 said that the banking department was scrambling and had to work all weekend. It was during this period that CW5's title was changed from Compliance Assurance Procedures Analyst to Banking Oversight Assurance Analyst. When CW5 asked for an explanation as to why, Mumper said it was to prevent CW5 from talking to FDIC auditors that investigated Higher One's banking relationships.

63. Higher One was able to replace Bancorp with unsuspecting new successor bank partners, which together were to perform the services previously performed by Bancorp: (a) Urban Trust Bank ("Urban Trust"), a federal savings bank, (b) Wright Express Financial Services Corporation ("Wright Express"), a Utah industrial bank that later became known as WEX Bank, and (c) Cole Taylor, an Illinois chartered bank and Federal Reserve member.

64. Whereas the Bancorp relationship had subjected Higher One to oversight by the FDIC only, these successor banking relationships subjected it to increased regulation, given that Urban Trust was regulated by the FDIC, Wright Express / WEX Bank was regulated by both the FDIC and Utah state regulators, and Cole Taylor was regulated by both the Federal Reserve and Illinois state regulators. Higher One thereafter was obligated to operate in accordance with not only the 2012 FDIC Consent Order – which it was actively violating – but also the requirements imposed and overseen by each of these regulatory bodies. Its failure to do so would jeopardize its successor bank partner relationships, without which it could not offer banking-related products like its OneAccount product, would expose it to additional sanctions and penalties, and

28

would damage its reputation and ability to continue to ink new successor bank contracts or even to stay in business.

65.     The Cole Taylor banking relationship is of particular significance to the alleged fraud at issue.  The Cole Taylor relationship began on March 29, 2012.  Significantly, the agreement between Higher One and Cole Taylor was for an initial five-year period, with automatic three-year renewals thereafter.

66.     CW6, a Cole Taylor Senior VP – Compliance Manager who oversaw Cole Taylor's compliance department, learned of the potential relationship with Higher One in February 2012, because his department became involved in the due diligence, which was overseen by Cole Taylor's CFO and its head of internal audit.  CW6 understood that Higher One was at that time with a bank (then Bancorp) and that bank wanted to exit the relationship.  CW6 said that Cole Taylor saw a potential relationship with Higher One as an opportunity to secure a large number of core deposit accounts.  Indeed, CW6 said that when the partnership with Higher One went live, and Higher One switched over its accounts to Cole Taylor in May 2012, Cole Taylor's account volume grew dramatically, from 35,000 to 90,000 accounts overnight.

67.     CW6 said that Cole Taylor was aware of and concerned about Higher One's troubles with the FDIC, the class action lawsuit, and Higher One's compliance problems.  CW6 said that while Higher One was supposedly changing its procedures, Higher One also offered Cole Taylor full indemnification for any legal proceedings, government investigations, or fines arising out of a potential relationship with Higher One.  CW6 said that the contract with Higher One memorialized the indemnification agreement, such that if any regulatory agency came after Cole Taylor or if any suit was filed against them, Cole Taylor would be 100% covered by Higher One.  CW6 said that Cole Taylor felt that it faced zero liability due to this indemnification, and

29

CW6 expressed doubt that Cole Taylor would have partnered with Higher One absent it.  For instance, CW6 recalls raising a concern that Higher One manually monitored transactions for compliance with Bank Secrecy Act regulations instead of using an automated system, but Cole Taylor was less concerned because Higher One was indemnifying the bank.

68.    CW4 said that Higher One Chief Service Officer Casey McGuane ("McGuane") managed Higher One's relationships with its partner banks, including Cole Taylor, and that its banking department, headed by Clark, oversaw and maintained the relationships with its partner banks more generally.  Significantly, as noted below, McGuane – like the Individual Defendants – engaged in insider sales of Higher One stock during the Class Period.

69.    CW5 observed that banking partners wanted to make sure that Higher One's processes were followed correctly.  CW5 said that banks either called or sometimes sent representatives to meet with Defendant Lasater and Clark.  After such meetings, Clark would relay to CW5 and the banking department if a bank was unhappy.

70.    CW4 said that months after entering into a five-year contract with Higher One, representatives of *Cole Taylor* began to express concern about Higher One's business practices. This began despite the indemnification agreement described by CW6.  CW4 said that conversations between Higher One and Cole Taylor over these concerns continued for between three and six months, in which Defendant Volchek, Defendant Lasater, and VP/General Counsel/Corporate Secretary Thomas Kavanaugh participated.  CW4 said that *Cole Taylor* gave 30- or 60-day notice that they were terminating the relationship.  CW4 said that ***Cole Taylor terminated its relationship with Higher One*** in 2013, due to fears that Cole Taylor would end up in regulatory trouble related to Higher One's consent agreement or lawsuits.  CW4 knew of these events because they were discussed among the C-level executives in the office, including CW4,

who participated in the discussions.  Significantly, during this time period, Defendants Volchek and Lasater engaged in significant Class Period insider sales of Higher One stock.

71.     CW4 said that Cole Taylor had expressed concern that Higher One had structured its website to force students to select a Higher One account and that that approach was likely to draw unwanted attention from regulators.  CW4 described the bank concerns as based upon their seeing the way the website's wording, navigation, and options were structured as "a very hard-push toward the Higher One account."  CW4 agreed that the website was geared towards making the Higher One account seem better than having the school mail a student a check for his or her disbursement balance or opening an account at another bank for the funds to be deposited there.

72.     CW4 said, "The other banks and the school mailing a check, those options were intentionally played down.  I know – I built the website."  CW4 said that Higher One's objective was to steer site users toward opening a OneAccount, because the only way it made money was to charge fees on the OneAccounts that students opened, and that the website poorly explained those "hidden fees."

73.     Underscoring that Higher One did not in any way want the Cole Taylor relationship to end, CW4 stated that there was a time in 2013 when Higher One almost went "belly up" because it could not find a bank partner to replace Cole Taylor.  CW4 said that Higher One "just barely" replaced Cole Taylor with Customers Bank, enabling it to stay in business.

74.     The fact that Cole Taylor terminated the relationship with Higher One is corroborated by the plain text of the 2014 Federal Reserve Cease and Desist Order (defined below), which stated, "Whereas, ***Cole Taylor* voluntarily terminated its arrangement with Higher One** in August 2013…."

31

**Materially False and Misleading**
**Statements Issued During the Period**

75.    During the Class Period, Defendants made materially false and misleading statements regarding Higher One's compliance with the obligations imposed by the 2012 FDIC Consent Order, regarding the termination of the Cole Taylor relationship, and regarding Higher One's reported operating results and the contribution of its OneAccounts to those results.

### *Legal Compliance Fraud*

76.    Defendants made a series of SEC filings and public statements as to Higher One's compliance with the obligations imposed by the 2012 FDIC Consent Order and its lack of additional material exposure to penalties thereunder.  They are directly contradicted by the CW statements as set forth in ¶¶49-74 herein, which make clear, *inter alia*, that Higher One's compliance program was a "joke," that it was slow to enact the bare "minimum" of changes, that its senior banking executives believed it did not need to comply with banking rules and regulations and instructed subordinates to that effect, that senior sales executives were never informed of any necessary changes to products or processes, and that by October 2013 (fourteen months after its issuance) there were still ten policies and procedures mandated by the 2012 FDIC Consent Order that had not yet been written.  The "Legal Compliance Fraud" included the following misstatements and omissions, which coincided with Defendants' significant insider sales and changes in employment statuses, as shown in Appendix D hereto.

77.    Higher One's Form 10-Q for the quarter ended June 30, 2012, was filed with the SEC on August 9, 2012 (the "Q2 2012 10-Q") and was signed by Defendants Volchek and Wallace and certified pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Volchek and Wallace.  It disclosed the 2012 FDIC Consent Order in language that included materially false and misleading statements.  Specifically, it stated in relevant part:

In February 2011, the New York Regional Office of the Federal Deposit Insurance Corporation, or FDIC, notified us that it was prepared to recommend to the Director of FDIC Supervision that an enforcement action be taken against us for alleged violations of certain applicable laws and regulations principally relating to our compliance management system and policies and practices for past overdraft charging on persistently delinquent accounts, collections and transaction error resolution.

***

On August 8, 2012, we received a Consent Order, Order for Restitution, and Order to Pay Civil Money Penalty, or the Consent Order, dated August 7, 2012, issued by the FDIC to settle such alleged violations. Pursuant to the terms of the Consent Order, we neither admitted nor denied any charges when agreeing to the terms of the Consent Order. ***Under the terms of the Consent Order, we are required to, among other things, review and revise our compliance management system and, to date, we have already substantially revised our compliance management system.***

***

As a result of the Consent Order and completion of the related examination, ***we believe that all material exposure related to this matter has been recorded and we do not expect any further losses as a result of this matter.***

78.     This same language was repeated in additional Higher One SEC filings during the Class Period, including:

(a)     Higher One's Form 10-Q for the quarter ended September 30, 2012, which was filed with the SEC on November 8, 2012 (the "Q3 2012 10-Q") and was signed by Defendants Volchek and Wallace and SOX certified by Defendants Volchek and Wallace;

(b)     Higher One's Form 10-K for the year ended December 31, 2012, which was filed with the SEC on March 4, 2013 (the "2012 10-K") and was signed and SOX certified by Defendant Volchek and was also signed by Defendants Lasater, Hatton, and McFadden; and

(c)     Higher One's Form 10-K for the year ended December 31, 2013, which was filed with the SEC on March 10, 2014 (the "2013 10-K") and was amended via a Form 10-K/A filed

with the SEC on April 4, 2014 (the "2013 10-K/A"), both of which were signed and SOX certified by Defendants Volchek and Wolf and both of which were also signed by Defendants Lasater, Hatton, and McFadden.

79.     The highlighted text quoted above and all the statements that contained it, as set forth in the preceding ¶¶77-78, were materially false and misleading, because, as set forth, *inter alia*, in ¶¶49-74:

(a)     Defendants had not "already substantially revised [the] compliance management system."   In violation of  2012 FDIC Consent Order ¶1 requiring Higher One to halt all violations of FTC Act §5 within *60 days*: (i) CW4 said that Defendant Lasater, who was leading Higher One's work under the 2012 FDIC Consent Order, wanted to do less, slower, such that Higher One was aiming to do the bare "minimum" and (ii) CW5, who was charged with writing Higher One's new banking operations policies and procedures, was given almost no support staff to assist in that work, such that by October 2013 (fourteen months after it issued), ten policies and procedures mandated by the 2012 FDIC Consent Order still needed to be written.   In violation of  2012 FDIC Consent Order ¶2, which required development and implementation of a sound risk-based compliance management system, CW5: (i) called Higher One's compliance program a "joke," (ii) described how its banking department head refused to alter existing policies when CW5 pointed out problems and told subordinates that Higher One did not have to comply with banking rules and regulations because it was a technology company, not a bank, and (iii) observed that Higher One was demonstrably slow to rectify misconduct, *e.g.*, delaying refunds of improper overdraft fees so that more fees were incurred.   In violation of the 2012 FDIC Consent Order ¶2, which required establishment and implementation of an effective training program: (i) CW5 said that employees were left to learn about any new procedures on

34

their own, such that the procedures CW5 wrote were not read by employees, (ii) CW1, a VP of Sales, said that no communications were sent to employees regarding the 2012 FDIC Consent Order or what changes needed to be made to comply with its terms, such that CW1 had no idea what products or practices needed to be changed and said that Higher One "misled employees" who were not fully informed, (iii) CW2, another VP of Sales, said that Higher One senior executives avoided answering questions about the issues raised by the 2012 FDIC Consent Order, to an extent that CW2 wanted to leave the company, and (iv) CW3, the HR Manager in charge of staffing and training at Higher One, could not recall any communications from management as to the 2012 FDIC Consent Order.

(b)     The statement "we believe all material exposure related to this matter has been recorded," which specifically references the 2012 FDIC Consent Order was a statement of then-present fact and then-present belief that lacked any credible basis given not only the reasons set forth in the preceding paragraph, but also Higher One's ongoing and widespread violations of FTC Act §5, in direct violation of the 2012 FDIC Consent Order's terms.  Among other things, 2012 FDIC Consent Order ¶1 barred any misleading or deceptive statements or omissions in OneAccount marketing; prohibited any misrepresentations or omissions regarding any product or service, including ones regarding *any and all fees* or *OneAccount terms or requirements*; and prohibited any violations of FTC Act §5.   Yet, Higher One was engaged in continuing, widespread violations of these very terms of the 2012 FDIC Consent Order throughout the Class Period, to such an extent that it incurred *$60 million* in aggregate fines, penalties, and restitution obligations because the Federal Reserve and FDIC found that it had engaged in deceptive practices in violation of FTC Act §5, misleading *1,325,000* students (representing roughly 70% of total OneAccounts) as discussed in ¶¶117-146 *infra*, by, *inter alia*: (i) failing to disclose the

fees, features, and limitations of OneAccounts, including unusual fees like a $0.50 fee for not using the debit card as a credit card and a 3.5% fee for withdrawing cash at a bank teller; (ii) concealing OneAccount fee information on its website until after students had selected their refund delivery choice and entered all personal information; (iii) omitting material information about how students could get financial aid refunds without opening a OneAccount while touting the speed of a OneAccount refund; (iv) omitting material information about the location and the hours of ATMs where OneAccounts could be accessed without fees; (iv) prominently displaying school logos and implying school endorsements of OneAccounts; and (v) failing to notify students that OneAccounts were Internet-only.  Significantly, CW4 said that Higher One had intentionally played down alternatives to the OneAccount so as to steer students into OneAccounts.  CW4 also said Cole Taylor had expressed concerns over Higher One's website's wording, navigation, and options being structured as a "very hard-push" to the OneAccount – the very issues that gave rise to the Federal Reserve and FDIC sanctions – to Defendants Volchek and Lasater for three to six months, before giving 30- or 60-day notice and then terminating its banking relationship with Higher One during the Class Period.  Higher One's Class Period misconduct was the same as its pre-Class Period misconduct, as depicted in Appendix B.  It was also continuous, such that Higher One literally *never* operated legally as a public company during relevant times, as shown in Appendix A.  Moreover, Higher One's Class Period misconduct was on such a sweeping scale that the fines, penalties, restitution obligations, and related costs it brought about were enough to wipe out *all* of Higher One's Class Period net income, as shown on Appendix C.

80.     Defendants also made materially false and misleading statements about Higher One's legal compliance and work with regulators during Class Period earnings calls with analyst and investors, such as:

(a)     On February 12, 2013, Higher One held an earnings call with analysts and investors (the "2/12/2013 Earnings Call"), on which Defendants Volchek and Lasater spoke. Defendant Lasater said during prepared remarks, "I think **we've made excellent progress in working with regulators** and legislators **to mitigate risks**."

(b)     On May 7, 2013, Higher One held an earnings call with analysts and investors (the "5/7/2013 Earnings Call"), on which Defendants Volchek, Wolf, and Lasater spoke.  During prepared remarks, Defendant Volchek said:

> As we are in a regulated consumer business, ***a focus on compliance and regulation remains key for Higher One***. When people understand the services we offer and compare us to other options, the value we provide is clear. We save money for schools and offer choice to students including low-cost, high-value financial services. In fact, if you look at the problems that regulators and legislators are trying to solve: fighting financial aid fraud, lowering administrative expenses for schools, improving graduation rates and others, our products and services help do just that. That said, the regulatory environment remains challenging. So ***I think our investments and compliance staff and compliance programs are moving us in the right direction***.

(c)     On August 8, 2013, Higher One held an earnings call with analysts and investors (the "8/8/2013 Earnings Call"), on which Defendants Volchek, Wolf, and Lasater participated. During prepared remarks, Defendant Volchek stated in relevant part:

> As we are in a regulated consumer business, ***a focus on compliance*** and regulation ***remains key for Higher One***. We operate in an evolving and complex compliance environment, and ***our investments in our compliance program and staff are moving us in the right direction***. … ***We are strengthening our compliance*** with additional hires and investing in automated systems and will continue to add resources.

81. These statements were materially false and misleading, *inter alia*, for the reasons set forth in ¶¶49-74, including:

(a)     The statement "we've made excellent progress in working with regulators and legislators to mitigate risks" was materially misleading because, after the 2012 FDIC Consent Order issued, Higher One changed the title of CW5, who was charged with writing its banking policies and procedures during the Class Period, from Compliance Assurance Procedures Analyst to Banking Oversight Assurance Analyst so as to prevent CW5 from talking to auditors investigating Higher One's banking relationships.  This change prevented FDIC auditors from speaking with CW5 during the Class Period and learning the substance of CW5's statements outlined herein, *e.g.*, that Clark told subordinates that Higher One did not need to comply with banking rules and regulations and refused to alter existing policies when CW5 pointed out problems, that ten policies required under the 2012 FDIC Consent Order had not been written fourteen months after it issued, and that the policies and procedures that CW5 did write were not read by employees.

(b)     Higher One did not have a "focus on compliance" where, in violation of  2012 FDIC Consent Order ¶1 requiring FTC Act §5 violations to end within *60 days* of its issuance: (i) Defendant Lasater, who led Higher One's compliance work under the 2012 FDIC Consent Order, wanted to do less, slower, such that it was aiming to do the bare "minimum," as stated by CW4, (ii) CW5, who was charged with writing Higher One's new banking operations policies and procedures, was given almost no support staff to assist in that work, such that by October 2013 (fourteen months later), ten policies and procedures mandated by the 2012 FDIC Consent Order still were unwritten, and (iii) CW5 observed that Higher One's banking department head

both refused to alter existing policies when CW5 pointed out problems with them and told subordinates that Higher One did not need to comply with banking rules and regulations.

(c)     Higher One's "compliance staff and compliance programs" were not "moving us in the right direction" where, in violation of 2012 FDIC Consent Order ¶2, which required a sound risk-based compliance management system and establishment of an effective training program: (i) CW5 called Higher One's compliance program a "joke" and described how its banking department head refused to alter existing policies when CW5 pointed out problems and told subordinates Higher One did not have to comply with banking rules and regulations because it was a technology company and not a bank, and (ii) CW5 said policies written by CW5 were not read by employees, who were left to learn about new procedures on their own, (iii) CW1 (a VP of Sales) said no communications were sent to employees regarding the 2012 FDIC Consent Order or what changes needed to be made to comply with its terms, so that CW1 had no idea what products or practices needed to be changed, and said that Higher One "misled employees" who were not fully informed, (iv) CW2 (another VP of Sales) said Higher One senior executives avoided answering questions about the 2012 FDIC Consent Order to an extent that CW2 wanted to leave the company, and (v) CW3 (the HR Manager in charge of staffing and training at Higher One), could not recall any communications from management to employees as to the 2012 FDIC Consent Order.

### *Cole Taylor Fraud*

82.     Defendants made a series of SEC filings and public statements as to the termination of the banking partner relationship, after only a short time, with Cole Taylor, which was one of the successor banks to Bancorp.  The Cole Taylor relationship began on March 29, 2012, and was expected to last for the duration of its **5-year** contractual term.  However, after

just ten and one-half months, Defendants disclosed that it had ended, mischaracterizing the decision as "mutual" and falsely reassuring analysts and investors that it was not related to any continued misconduct.  In reality, though, as discussed in ¶¶62-74 *supra*, even after having been given full indemnification by Higher One, ***Cole Taylor*** began expressing concerns about Higher One's business practices just months into the relationship, and after three to six months of doing so in discussions with Defendants Volchek and Lasater, ***Cole Taylor*** gave 30- or 60-day notice of termination, and then ***Cole Taylor*** **terminated** the relationship.  The "Cole Taylor Fraud" included the following misstatements and omissions, which coincided with Defendants' significant insider sales and changes in employment statuses as shown in Appendix D.

83.   On February 12, 2013, Higher One filed a Form 8-K with the SEC, signed by Defendant Volchek ("2/12/2013 Cole Taylor 8-K"), in which it stated that a Higher One subsidiary and Cole Taylor Bank had "***agreed to a mutual termination***," effective August 30, 2013, of the Deposit Processing Services Agreement between them that had been entered into on March 29, 2012 – less than one year earlier.

84.   This statement was materially false and misleading because, as set forth in ¶¶62-74 based on the statements of CW4, CW5, and  CW6, Higher One desperately needed the Cole Taylor relationship in order to remain in business and did not want it to end, whereas ***Cole Taylor***, mere months into the relationship, began expressing concerns about Higher One's business practices in discussions with Defendants Volchek and Lasater that lasted for three to six months before ***Cole Taylor*** delivered to Higher One a 30- or 60-day notice of termination that led to ***Cole Taylor*** terminating the 5-year relationship after just ten and one-half months, due to concerns that it would end up in regulatory trouble related to Higher One's consent agreement and lawsuits.  Cole Taylor's decision to terminate the relationship was prompted, *inter alia*, by

40

serious concerns over Higher One's website marketing of the OneAccount, including that its wording, navigation, and options were structured as a "very hard-push toward the Higher One account," which CW4, who built the website, said was to fulfill Higher One's objective to steer site users toward opening a OneAccount while poorly explaining "hidden fees." These are the very concerns that gave rise to the 2014 Federal Reserve Cease and Desist Order and the 2015 Federal Consent Order, as discussed in ¶¶117-146, *infra*. Indeed, the 2014 Federal Reserve Cease and Desist Order expressly states that "Cole Taylor voluntarily terminated its agreement with Higher One in August 2013…." Having opted to discuss the Cole Taylor agreement termination, Defendants Higher One and Volchek were under a duty to speak the whole truth, which they violated.

85.     On the 2/12/2013 Earnings Call, Defendants Volchek and Lasater made the following materially false and misleading statements:

(a)     During prepared remarks, Defendant Lasater spoke about the Cole Taylor termination, once again mischaracterizing it as "mutual" while not disclosing its true reason, stating, "While we've enjoyed working with Cole Taylor Bank over this past year, we have made *a mutual agreement* with Cole Taylor to transfer the deposits they hold on our behalf to other partner banks. … We're extremely encouraged by the feedback we've gotten from our other bank partners who say that our partnership is going well from their perspective."

(b)     In the question and answer portion of the teleconference, Defendant Lasater made blatantly false and misleading statements when asked point blank about the Cole Taylor termination. Specifically, this exchange with an analyst at JMP Securities:

> Analyst:  A few things I'll try to run through quick. First, Cole Taylor Bank, obviously, you touched on that termination. They weren't -- it didn't look like they'll be with you particularly long. Can you give any particular color on what sort of caused the break? Is there any sort of ramifications for other bank

41

relationships that you have? Just any sort of color you can give us around that and [indiscernible].

Miles Lasater - Co-Founder, Chairman, President and Chief Operations Officer: This is Miles. Our multi-bank strategy is built around having multiple banks, built around being able to change banks when necessary. While we certainly hope for longer-term relationships, and that's what we seek, and *we feel that we've had a good partnership with Cole Taylor*, we do understand that circumstances change for banks. And so we're looking either to add more partners or the current partners that we have, have interesting capacity to handle the deposits without Cole Taylor. So *we feel that the program design is really working as intended*.

Analyst:  Was it a -- so we can infer that as a mutual thing versus some sort of they should have made some move or -- I mean, which is the way we should sort of view it?

Miles Lasater - Co-Founder, Chairman, President and Chief Operations Officer: *Yes, you're correct. It was a mutual decision that we made*. I think we filed an 8-K with some information on that. We've signed a transition agreement with them, so we can have [indiscernible] transition that won't have much impact on customers. And we're very focused on that to make sure that, that is a smooth process for sure. And we wish them the best of luck. We're going to be working together certainly over the next coming months and *have been happy with the relationship* today.

86.    These statements were materially false and misleading because, as set forth in ¶¶62-74 based on the statements of CW4, CW5, and  CW6, Cole Taylor had made clear to Higher One  during months of discussions with Defendants Volchek and Lasater that there was no basis for anyone to characterize the relationship as something to have been "happy with," that it was not a "good partnership," and that the "program" was not "working" because Higher One's business practices could not withstand scrutiny by its banking partners, as evidenced by the fact that Cole Taylor had expressed serious concerns within just a few months of partnering with Higher One, which proved to be unresolvable after three to six months of discussions. Moreover, it was utterly false to characterize the termination as "mutual," when it was based on *Cole Taylor* initiating discussions over three to six months about its serious concerns, including those regarding the website marketing of the OneAcount, *Cole Taylor* providing 30- to 60-day

notice of termination, and **_Cole Taylor_** ultimately terminating the relationship for the very issues that gave rise to the 2014 Federal Reserve Cease and Desist Order and the 2015 Federal Reserve Consent Order, as discussed in ¶¶117-146, *infra*.  Indeed, the 2014 Federal Reserve Cease and Desist Order expressly states that "Cole Taylor voluntarily terminated its agreement with Higher One in August 2013…."  Having opted to discuss the Cole Taylor agreement termination, Defendants Higher One and Lasater were under a duty to speak the whole truth, which they violated.

87.   Higher One's 2012 10-K, which was filed with the SEC on March 4, 2013 and was signed by Defendants Volchek (who also SOX certified it), Lasater, Hatton, and McFadden, made the following materially false and misleading statements about the Cole Taylor agreement termination:  "On February 8, 2013, ***we agreed to a mutual termination with Cole Taylor*** of our Deposit Processing Services Agreement, effective August 30, 2013.  We plan to move the functions and services performed by Cole Taylor to our Bank Partners or other bank partners, and may add additional bank partners as necessary."

88.   This statement was materially false and misleading because, as set forth in ¶¶62-74 based on the statements of CW4, CW5, and  CW6, Higher One desperately needed the Cole Taylor relationship to remain in business and did not want it to end, whereas **_Cole Taylor_**, mere months into the relationship, was expressing concerns about Higher One's business practices in discussions with Defendants Volchek and Lasater for three to six months before **_Cole Taylor_** delivered a 30- or 60-day notice of termination that led to **_Cole Taylor_** terminating the 5-year relationship after just ten and one-half months, due to concerns it would end up in regulatory trouble related to Higher One's consent agreement and lawsuits.  Cole Taylor's decision to terminate the relationship was prompted, *inter alia*, by serious concerns over Higher One's

website marketing of the OneAccount, including that its wording, navigation, and options were structured as a "very hard-push toward the Higher One account," which CW4, who built the website, said was to fulfill Higher One's objective to steer site users toward opening a OneAccount while poorly explaining "hidden fees."  These are the very concerns that gave rise to the 2014 Federal Reserve Cease and Desist Order and the 2015 Federal Reserve Consent Order, as discussed in ¶¶117-145, *infra*.  Indeed, the 2014 Federal Reserve Cease and Desist Order expressly states that "Cole Taylor voluntarily terminated its agreement with Higher One in August 2013…."  Having chosen to discuss the Cole Taylor agreement termination, Defendants Higher One, Volchek, Lasater, Hatton, and McFadden were under a duty to speak the whole truth, which they violated.

89.     On July 18, 2013, Higher One filed a Form 8-K with the SEC, signed by Defendant Volchek ("7/18/2013 8-K"), in which it stated that Higher One and Cole Taylor had "entered into an amendment…to the Deposit Processing Services Agreement between them" under which "the parties agreed to extend the term of the Agreement to October 31, 2013" and "[a]fter August 31, 2013, Cole Taylor may provide deposit services for a reduced number of accounts."  The 7/18/2013 8-K discussed payments to Cole Taylor for its services, and then added, "Higher One intends to move all accounts held at Cole Taylor to its other bank partners by August 31, 2013 and entered into the Amendment to help ensure a smooth transition in the event that it is unable to transfer all accounts by that date."

90.     This statement was materially false and misleading because it omitted the details, as set forth in ¶¶62-74 based on the statements of CW4, CW5, and  CW6, that Higher One desperately needed the Cole Taylor relationship to remain in business and did not want it to end, whereas **Cole Taylor**, mere months into the relationship, had expressed serious concerns about

Higher One's business practices in discussions with Defendants Volchek and Lasater for three to six months before **Cole Taylor** delivered a 30- or 60-day notice of termination that led to ***Cole Taylor*** terminating the 5-year relationship after just ten and one-half months, due to concerns it would end up in regulatory trouble related to Higher One's consent agreement and lawsuits – the same concerns that gave rise to the 2014 Federal Reserve Cease and Desist Order and the 2015 Federal Reserve Consent Order, as discussed in ¶¶117-146, *infra*. Indeed, the 2014 Federal Reserve Cease and Desist Order expressly states that "Cole Taylor voluntarily terminated its agreement with Higher One in August 2013…." Having chosen to discuss the Cole Taylor agreement termination, Defendants Higher One and Volchek were under a duty to speak the whole truth, which they violated.

91.   On November 7, 2013, Higher One held an earnings call with analysts and investors (the "11/7/2013 Earnings Call"), on which Defendants Volchek and Lasater spoke. During prepared remarks, Defendant Volchek spoke about the transition from Cole Taylor to a successor bank partner, Customers Bank, making the following materially false and misleading statements:

> Our business model covers two highly regulated industries: Higher Education and financial services. And as such, ***compliance*** and regulations ***remain a key focus for Higher One***. Last quarter, we signed an agreement to add Customers Bank as one of our bank partners. ***We transferred deposits from our previous bank partner*** on a timely basis and ***without impact to our customers holding those accounts***. As part of this change, we've made alterations to our customer identification program processes to align with our bank partners. As part of our bank partner oversight, we continue to evaluate our processes and procedures in this area. These changes have added more expenses, unrelated personnel and caused decreases to expected account revenue.
>
> Multiple bank partners with multi-regulatory oversight have led to difficult and complex operating environment. This is exemplified by the recent changes made to our compliance efforts when working with our bank partners. This also extends to the multiple regulators that we work with. ***In the past year, we have made changes to the fee structure by OneAccount to alleviate concerns regarding fees***

*charged to consumers*. We continually assess our banking relationships and the proper structure of these relationships is key to our business.

92.     These statements were materially false and misleading because they omitted the details, as set forth in ¶¶62-74 based on the statements of CW4, CW5, and CW6, that Customer Bank's predecessor, *Cole Taylor*, mere months into its banking relationship with Higher One, had expressed serious concerns about Higher One's business practices in discussions with Defendants Volchek and Lasater for three to six months before *Cole Taylor* delivered a 30- or 60-day notice of termination that led to *__Cole Taylor__* terminating the 5-year relationship after just ten and one-half months, due to concerns it would end up in regulatory trouble related to Higher One's consent agreement and lawsuits – the same concerns that gave rise to the 2014 Federal Reserve Cease and Desist Order and the 2015 Federal Reserve Consent Order, as discussed in ¶¶117-146, *infra*.  Indeed, the 2014 Federal Reserve Cease and Desist Order expressly states that "Cole Taylor voluntarily terminated its agreement with Higher One in August 2013…." Contrary to the statement that handling of the OneAccounts formerly held by Cole Taylor was "without impact to our customers holding those accounts," the business practices that prompted Cole Taylor to terminate its relationship with Higher One were *gravely* affecting its customers with OneAccounts, prompting Cole Taylor to seek to terminate the relationship and causing the FDIC and Federal Reserve to impose massive penalties and restitution obligations.  Contrary to the statement that "In the past year, we have made changes to the fee structure by OneAccount to alleviate concerns regarding fees charged to consumers," CW4 said that Higher One's website had been designed to steer students into OneAccounts while poorly explaining their "hidden fees" and that this "very hard-push toward the Higher One account" was a serious concern for Cole Taylor that led to its terminating the partner relationship with Higher One.  **Having chosen**

46

to discuss the transition of OneAccounts from Cole Taylor to a successor bank, Defendants Higher One and Volchek were under a duty to speak the whole truth, which they violated.

93.     On February 13, 2014, Higher One issued a press release, in which Defendant Volchek was quoted (the "2/13/2014 Press Release") and which was filed with the SEC as an exhibit to a Form 8-K signed by Defendant Volchek (the "2/13/2014 8-K"), announcing its financial and operating results for Q4 2013 and calendar 2013.  The 2/13/2014 Press Release quoted Defendant Volchek as saying, "We continue to operate in a difficult and complex operating environment due in part to our relationships with multiple bank partners that are overseen by different regulators."

94.     This statement was materially false and misleading because it omitted the details, as set forth in ¶¶62-74 based on the statements of CW4, CW5, and  CW6, that Cole Taylor, one of Higher One's banking partners, had terminated its relationship with Higher One due to serious concerns, express over many months in discussions with Defendants Volchek and Lasater, about Higher One's business practices and about its risk of regulatory trouble related to Higher One's consent agreement and lawsuits – the same concerns that gave rise to the 2014 Federal Reserve Cease and Desist Order and the 2015 Federal Reserve Consent Order, as discussed in ¶¶117-146, *infra*.  Indeed, the 2014 Federal Reserve Cease and Desist Order expressly states that "Cole Taylor voluntarily terminated its agreement with Higher One in August 2013…."  Having chosen to discuss Higher One's banking partner relationships, Defendants Higher One and Volchek were under a duty to speak the whole truth, which they violated.

### *Products Transparency Fraud*

95.     Defendants' fraud also extended to their statements regarding Higher One's products, processes, and transparency.  Their statements in the "Products Transparency Fraud,"

like the "Legal Compliance Fraud" misstatements, were directly contradicted, *inter alia*, by those of the CWs, as alleged in ¶¶49-74 and coincided with Defendants' significant insider sales and changes in employment statuses as shown in Appendix D.

96.     On August 7, 2012, Higher One held an earnings call with analysts and investors (the "8/7/2012 Earnings Call"), on which Defendants Volchek and Lasater spoke, making the following materially false and misleading statements:

(a)  During prepared remarks, Defendant Lasater said

Because we founded the company as college students, we understand what's important to the student. ***We have always put an emphasis on transparency and disclosure***. ***Our disclosure schedule is never more than a click away on our student-facing website***. And ***we go out of our way to educate customers on how to avoid fees***.

Before a student signs up for an account, the fee schedule pops up across the screen and the customer must acknowledge that they have seen it and understand our pricing structure. ***Regular users of our service understand that our fee schedule is transparent and fair***.

(b)     Also during prepared remarks, Defendant Lasater stated:

***For now, we continue to correct the inaccurate portrayals of our business, and we continue to make targeted outreach to our key constituencies***: *sch*ools, ***students***, ***regulators***, and legislatures ***to do so***. ***In all of our outreach, our focus is to share the facts***. We show our fee schedule, compared to other checking accounts. We show how much less the average of One Account customer pays per year, compared to other checking accounts. We show that in recent months, a number of banks announced monthly fees for entry-level checking accounts. When we engage in a fact-based dialogue with our key constituents, the value that Higher One provides to both schools and students becomes abundantly clear.

97.     These statements were materially false and misleading for the reasons set forth in ¶¶49-74, including:

(a)     Higher One did not have an "emphasis on transparency and disclosure" and was not making "targeted outreach to…regulators" with a "focus…to share the facts" where, *inter alia*, Higher One's website marketing of the OneAccount, including its wording, navigation, and

options were structured as a "very hard-push toward the Higher One account," which CW4, who built the website, said was to fulfill Higher One's objective to steer site users toward opening a OneAccount while poorly explaining "hidden fees." These are the very concerns that led Cole Taylor to terminate its partner relationship with Higher One and that gave rise to the 2014 Federal Reserve Cease and Desist Order, the 2015 Federal Reserve Consent Order, and the 2015 FDIC Consent Order as discussed in ¶¶117-146, *infra*. Also, CW5, who wrote Higher One's banking policies and procedures during the Class Period, said that, after the 2012 FDIC Consent Order, as Higher One was having trouble finding bank partners, CW5's title was changed from Compliance Assurance Procedures Analyst to Banking Oversight Assurance Analyst, and was told by CW5's superior that the reason for the change was to prevent CW5 from talking to auditors investigating Higher One's banking relationships. This change prevented FDIC auditors from speaking with CW5 during the Class Period and learning the substance of CW5's statements outlined herein, *e.g.*, that Clark told subordinates that Higher One did not need to comply with banking rules and regulations and refused to alter existing policies when CW5 pointed out problems, that ten policies required under the 2012 FDIC Consent Order had not been written fourteen months after it issued, and that the policies and procedures that CW5 did write were not read by employees.

(b)     The statement "Our disclosure schedule is never more than a click away on our student-facing website" was materially false and misleading because CW4 said that Higher One's website had been structured so as to steer students into OneAccounts while concealing their "hidden fees," a concern that led Cole Taylor to initiate discussions, a notice of termination, and a termination of its partner relationship with Higher One. Moreover, as discussed in ¶¶141 and 145 *infra*, the 2015 FDIC Consent Order and the 2015 Federal Reserve Consent Order both

49

found that, in violation of FTC Act §5, throughout the Class Period, Higher One had failed to display a complete fee schedule on its student-facing website until after students had selected their financial aid refund delivery choice and entered all personal information.

(c)    The statements "we go out of our way to educate consumers on how to avoid fees," "regular users of our service understand that our fee schedule is transparent and fair," and "we continue to correct the inaccurate portrayals of our business, and we continue to make targeted outreach to our key constituencies:…students, regulators…to do so.  In all our outreach, our focus is to share the facts" are all materially false and misleading because, as stated by CW4, who built Higher One's website, it was designed as a "very hard-push toward the Higher One account," so as to fulfill Higher One's objective to steer site users toward opening a OneAccount while poorly explaining "hidden fees."  Higher One's improprieties concerning, *inter alia*, its practices regarding OneAccount fees during the Class Period gave rise to the 2014 Federal Reserve Cease and Desist Order, the 2015 Federal Reserve Consent Order, and the 2015 FDIC Consent Order, as discussed in ¶¶117-146, *infra*.  This misconduct caused it to incur $60 million in aggregate fines, penalties, and restitution obligations imposed by the Federal Reserve and FDIC, which found that it had engaged in deceptive practices in violation of FTC Act §5, misleading *1,325,000* students (representing roughly *70%* of total OneAccounts) as discussed in ¶¶117-145 *infra*, by, *inter alia*: (i) failing to disclose the fees, features, and limitations of OneAccounts, including unusual fees like a $0.50 fee for not using the debit card as a credit card and a 3.5% fee for withdrawing cash at a bank teller; (ii) concealing OneAccount fee information on its website until after students had selected their refund delivery choice and entered all personal information; (iii) omitting material information about how students could get their financial aid refund without opening a OneAccount while touting the speed of a OneAccount

refund; (iv) omitting material information about the location and the hours of ATMs where OneAccounts could be accessed without fees; (iv) prominently displaying school logos and implying school endorsements of OneAccounts; and (v) failing to notify students that OneAccounts were Internet-only.  Significantly, CW4 said that Higher One had intentionally played down alternatives to the OneAccount and poorly explained its "hidden fees," so as to steer students into OneAccounts.  CW4 also said Cole Taylor had expressed concerns over Higher One's website's wording, navigation, and options being structured as a "very hard-push" to the OneAccount – the very issues that gave rise to the Federal Reserve and FDIC sanctions – to Defendants Volchek and Lasater for three to six months, before giving 30- or 60-day notice and then terminating its banking relationship with Higher One during the Class Period.  Higher One's Class Period misconduct was the same as its pre-Class Period misconduct, as depicted in Appendix B; was continuous, such that Higher One literally ***never*** operated legally as a public company during relevant times, as shown in Appendix A; and was on such a large scale that the fines, penalties, and restitution it brought about wiped out ***all*** of Higher One's Class Period net income, as shown on Appendix C.

98.    Defendants also perpetrated their fraud when asked direct questions by analysts trying to understand what steps Higher One was taking so as to comply with its legal obligations, including those under the 2012 FDIC Consent Order.

99.    For instance, on November 6, 2012, Higher One held an earnings call with analysts and investors (the "11/6/2012 Earnings Call"), on which Defendants Volchek and Lasater participated.  During the question and answer session, Defendant Lasater made the following materially false and misleading statements:

> Analyst:  And then a couple of things, which Mark, I think you mentioned a
> couple of minutes ago the new requirements around account opening, I'd

appreciate if you could drill down a little bit more into exactly what that means and when the change happens….

Defendant Lasater:  … The other part of your question was around the account opening process and changes we've made there and it's probably detailed on the screens, it would be hard to describe verbally. But **we're talking about adding other steps to the process to ensure that our customers fully understand the choices, which is always something that we've believed in**. We've been committed to value, transparency and choice for our consumer and we've been backing that up, but that does mean from a practical perspective, there are more steps involved it's a little less easy to open the account than it was previously and I think **many of these are changes we implemented over the last few months**.

100.    The statement that Higher One had "add[ed] other steps to the process to ensure that our customers fully understand the choices" regarding the OneAccount and that those were "changes we implemented over the last few months" was materially false and misleading because, as discussed in ¶¶49-74 *supra* and stated by CW4, who built Higher One's website, it was designed as a "very hard-push toward the Higher One account," to fulfill Higher One's objective to steer site users toward opening a OneAccount while poorly explaining "hidden fees."   Higher One's improprieties concerning, among other things, its practices regarding OneAccount fees during the Class Period gave rise to the 2014 Federal Reserve Cease and Desist Order, the 2015 Federal Reserve Consent Order, and the 2015 FDIC Consent Order, as discussed in ¶¶117-146, *infra*.  This misconduct caused it to incur $60 million in aggregate fines, penalties, and restitution obligations imposed by the Federal Reserve and FDIC, which found that it had engaged in deceptive practices in violation of FTC Act §5, misleading *1,325,000* students (representing roughly *70%* of total OneAccounts) as discussed in ¶¶117-146 *infra*, by, *inter alia*: (i) failing to disclose the fees, features, and limitations of OneAccounts, including unusual fees like a $0.50 fee for not using the debit card as a credit card and a 3.5% fee for withdrawing cash at a bank teller; (ii) concealing OneAccount fee information on its website until after students had selected their refund delivery choice and entered all personal information; (iii) omitting

material information about how students could get their financial aid refund without opening a OneAccount while touting the speed of a OneAccount refund; (iv) omitting material information about the location and the hours of ATMs where OneAccounts could be accessed without fees; (iv) prominently displaying school logos and implying school endorsements of OneAccounts; and (v) failing to notify students that OneAccounts were Internet-only.  Significantly, CW4 said that Higher One had intentionally played down alternatives to the OneAccount so as to steer students into OneAccounts.  CW4 also said Cole Taylor had expressed concerns over Higher One's website's wording, navigation, and options being structured as a "very hard-push" to the OneAccount – the very issues that gave rise to the Federal Reserve and FDIC sanctions – to Defendants Volchek and Lasater for three to six months, before giving 30- or 60-day notice and then terminating its banking relationship with Higher One during the Class Period.  Higher One's Class Period misconduct was the same as its pre-Class Period misconduct, as depicted in Appendix B; was continuous, such that Higher One literally *never* operated legally as a public company during relevant times, as shown in Appendix A; and was on such a large scale that the fines, penalties, and restitution it brought about wiped out *all* of Higher One's Class Period net income, as shown on Appendix C.

101.    Defendants Volchek and Lasater also repeatedly made materially false and misleading statements touting the positive changes purportedly made to Higher One's products and processes, including specifically as regards to its OneAccount product, in the wake of the 2012 FDIC Consent Order and the Class Action Settlement.  For instance:

(a)    On the 2/12/2013 Earnings Call, Defendant Lasater said, "We have expanded our product offering and *made changes to certain processes as we work to set the industry standard for regulatory compliance*."

(b)     On the 5/7/2013 Earnings Call, Defendant Volchek said, "*Over the past few years, we have made a number of changes to our products and processes to respond to the regulatory environment*…."

(c)     On the 8/8/2013 Earnings Call, Defendant Volchek said, "*Over the past few years, we have made a number of changes to our products and processes to make our offering even more consumer-friendly*."

(d)     On August 8, 2013, Higher One issued a press release (the "8/8//2013 Press Release") that was filed with the SEC as an exhibit to a Form 8-K/A signed by Defendant Wolf (the "8/8/2013 8-K/A") announcing financial and operating results for Q2 2013.  The 8/8/2013 Press Release quoted Defendant Volchek as stating, "We have made *changes to the fee schedule for the OneAccount* over the past year.  These changes *make the account even more consumer-friendly* than it already was, as we continue to compare favorably to the other student checking and prepaid card options for students."

(e)     On the 11/7/2013 Earnings Call, Defendant Volchek said, "*For our account holders, we have made a number of changes to our products and processes to make our offerings even more consumer friendly*."

(f)     On Higher One's February 13, 2014 earnings call with analysts and investors (the "2/13/2014 Earnings Call"), Defendant Volchek said, "*During 2013, a number of changes were made to our products and processes*. Some of these changes have a direct effect to lower revenue or increase expenses. We made these changes, and we believe in the long run this will be positive for the business. *We believe that these changes have helped* our sales teams in our effort to sign new refund clients and *in our relations with OneAccount holders*."

102.     These statements by Defendants Volchek and Lasater were materially false and misleading, because the OneAccount product was not "more consumer friendly" and "relations with OneAccount holders" were not helped or improved by any purported Class Period changes to the OneAccount product, and because Higher One was concealing facts from regulators instead of trying to change its products and processes to meet their concerns.  As discussed in ¶¶49-74 *supra*, CW5 was charged with writing Higher One's revised banking operations policies and procedures, but was given no support staff, such that ten necessary policies were still unwritten by October 2013, fourteen months after the 2012 FDIC Consent Order issued.  CW5 observed that Higher One's banking department head refused to alter existing policies when CW5 pointed out problems and told subordinates that Higher One need not comply with banking rules and regulations.  CW5 also observed that Higher One was demonstrably slow to rectify misconduct, *e.g.*, delaying refunds of improper overdraft fees so that more fees were incurred by customers.  CW5 and CW3 observed a lack of employee training, such that CW5 noted that employees were left to read new policies on their own and CW5's revised procedures went unread.  CW1 and CW2 corroborated that senior sales executives had no idea what products or practices needed to be changed following the 2012 FDIC Consent Order.  Higher One changed CW5's title so as to preclude CW5 from having to talk with FDIC auditors about the foregoing facts, thereby seeking to intentionally conceal them from regulators.  Moreover, the statement of CW4, who built Higher One's website, further demonstrated the materially false and misleading nature of the statement, "We have made changes to the fee schedule for the OneAccount over the past year.  These changes make the account even more consumer-friendly than it already was, as we continue to compare favorably to the other student checking and prepaid card options for students."  According to CW4, Higher One's website marketing of the OneAccount, including its

wording, navigation, and options were structured as a "very hard-push toward the Higher One account," which was to fulfill Higher One's objective to steer site users toward opening a OneAccount while poorly explaining "hidden fees." CW3's research indicated that consumers registered complaints concerning those hidden fees. Also, in violation of the 2012 FDIC Consent Order ¶1, Higher One was engaged in ongoing and widespread violations of FTC Act §5, including, *inter alia*, via misrepresentations and omissions regarding the OneAccount and charging of improper fees to OneAccount holders, to such an extent that it incurred $60 million in aggregate fines, penalties, and restitution obligations imposed by the Federal Reserve and FDIC. Higher One's Class Period misconduct was the same as its pre-Class Period misconduct, as depicted in Appendix B. It was also continuous, such that Higher One literally ***never*** operated legally as a public company during relevant times, as shown in Appendix A. Moreover, its Class Period misconduct was on such a sweeping scale that the fines, penalties, and restitution it brought about were enough to wipe out ***all*** of Higher One's Class Period net income, as shown on Appendix C.

### ***Class Action Resolution Fraud***

103.    Defendants also engaged in fraud regarding Higher One's purported "practice changes" that were made, along with payment of $15 million, so as to settle class action claims regarding its pre-Class Period misconduct. Yet, throughout the Class Period, Higher One continued to engage in the ***same*** misconduct that gave rise to the class action claims, as shown in Appendix B. The "Class Action Resolution Fraud" consisted of the following misstatements and omissions, which coincided with Defendants' significant insider sales and changes in employment statuses as shown in Appendix D.

104.    Defendants repeatedly touted the "practice changes" that Higher One had agreed to make as part of the Class Action Settlement so as to resolve the alleged misconduct at issue in the consumer class actions, including the following false and misleading statements:

(a)    Higher One's Form 10-Q for the quarter ended September 30, 2013, was filed with the SEC on November 8, 2013 (the "Q3 2013 10-Q") and was signed and SOX certified by Defendants Volchek and Wolf.  It stated, "In October 2013, we reached an agreement in principle on the key terms of a preliminary settlement that would resolve the MDL. The terms… include a payment of approximately $15.0 million *and an agreement to make and/or maintain certain practice changes*."

(b)    On November 5, 2013, Higher One issued a press release (the "11/5/2013 Press Release"), which was filed with the SEC as an exhibit to a Form 8-K that was signed by Defendant Wolf (the "11/5/2013 8-K"), stating that it had reached an agreement in principal to settle the consumer class action for consideration including payment of approximately $15.0 million and "*an agreement to make and/or maintain certain practice changes*."

(c)    The 2013 10-K stated, "In October 2013, we reached an agreement in principle on the key terms of a settlement that would resolve all of the above class action litigation that was filed against us in 2012. In February 2014, we executed a settlement agreement, the terms of which include a payment of $15.0 million to a settlement fund, an agreement to pay the cost of notice to the class, *and an agreement to make and/or maintain certain practice changes*."

105.    These statements were materially false and misleading because, contrary to the commitments it made in settling the class action lawsuit, Higher One failed to make any meaningful "practice changes" and, instead, was continuing to violate consumer protection statutes, including FTC Act §5 and state consumer laws, throughout the Class Period, especially

by the dates of these statements.  The CW statements set forth in ¶¶49-74 above illustrate these

violations.  As CW4 stated, Defendant Lasater, who was leading Higher One's work under the

2012 FDIC Consent Order, wanted to do less, slower, such that Higher One was aiming to do the

bare "minimum" to change its practices.  CW5, who wrote Higher One's new banking operations

policies and procedures, was given almost no support staff to assist in that work, such that by

October 2013 – fourteen months after the 2012 FDIC Consent Order entered and *just before*

these statements were made – ten policies and procedures mandated by it were still unwritten.

CW5 called Higher One's compliance program during the Class Period a "joke," and described

how its banking department head refused to alter existing policies when CW5 pointed out

problems and told subordinates that Higher One did not have to comply with banking rules and

regulations because it was a technology company, not a bank.  CW5 observed that Higher One

was demonstrably slow to rectify misconduct, *e.g.*, delaying refunds of improper overdraft fees

so that more fees were incurred.  CW5 said that employees were left to learn about any new

procedures on their own, such that the procedures CW5 wrote were not read by employees.

Statements by CW1, CW2, and CW3 made clear that senior sales executives had no idea what

products or practices needed to be changed and that its employees were "misled," not fully

informed, and received no guidance from management.  CW4 said that Higher One's website

marketing of the OneAccount, including its wording, navigation, and options were structured as

a "very hard-push toward the Higher One account," so as to fulfill Higher One's objective to

steer site users toward opening a OneAccount while poorly explaining "hidden fees."  CW4

added that these practices had prompted Cole Taylor to express concerns in discussion with

Defendants Volchek and Lasater (a few months after Cole Taylor's partnership agreement was

executed in March 2012), to provide a 30- or 60-day notice of termination (in December 2012 or

January 2013), and to terminate the relationship (in February 2013) – all ***well before*** these statements were made.  These are the very concerns that gave rise to the 2014 Federal Reserve Cease and Desist Order, the 2015 Federal Reserve Consent Order, and the 2015 FDIC Consent Order, as discussed in ¶¶117-146, *infra*.  Higher One's Class Period misconduct was the same as its pre-Class Period misconduct – including the misconduct at issue in the settled class action – as depicted in Appendix B.  It was also continuous, such that Higher One literally ***never*** operated legally as a public company during relevant times, as shown in Appendix A.  Moreover, its Class Period misconduct was on such a sweeping scale that the fines, penalties, and restitution it brought about were enough to wipe out ***all*** of its Class Period net income, as shown on Appendix C.

106.    In addition, on the 11/7/2013 Earnings Call, Defendant Volchek stated:

> During the quarter, we accrued an expense of $16.3 million, which includes the proposed $15 million settlement fund amount and $1.3 million related to our estimated legal cost and other cost to administrators [sic] the settlement. We maintain, and have always maintained, that our business practices are lawful and proper and that the claims and lawsuit are without merit. We continue to believe that we offer outstanding products to both colleges and students and have entered into this agreement in principle to avoid a lengthy and costly litigation process, and to minimize business disruption in offering our valued services to students and institutions of higher education. ***This settlement if finalized and approved, would resolve all outstanding class action litigation against Higher One, involving the marketing usage of our OneAccount suite***.

107.    This statement was materially misleading because, while technically true that the class action itself was settled for the consideration referenced, Higher One's misconduct continued unabated during the Class Period – including the very misconduct that was at issue in the class action, as shown in Appendix B – exposing it to considerable additional fines, penalties, and restitution obligations, as were imposed by the 2014 Federal Reserve Cease and Desist Order, the 2015 Federal Reserve Consent Order, and the 2015 FDIC Consent Order, as discussed

in ¶¶117-146, *infra*.  Moreover, its continuing misconduct exposed it to the risk that it would be found to have violated the Class Action Settlement, which among other consideration, required "practice changes" as discussed *supra*.  Ultimately, Higher One's misconduct was on such a scale that it literally ***never*** operated legally as a public company during relevant times, as shown in Appendix A, and that the fines, penalties, and restitution it brought about were enough to wipe out ***all*** of its Class Period net income, as shown on Appendix C.

### *Operating Results Fraud*

108.    Higher One made a series of filings and public statements reporting revenues, net income, and earnings without disclosing that they were being generated through improper and illegal practices that violated the 2012 FDIC Consent Order, FTC Act §5, and other applicable laws.  These statements also touted Higher One's number of OneAccounts, and growth in those accounts, as the primary contributor to these results, without disclosing that the OneAccounts were improperly marketed and used to generate improper and illegal revenues in violation of  the 2012 FDIC Consent Order, FTC Act §5, and applicable laws.  These misstatements violated, *inter alia*, Regulation S-K, Item 303, 17 C.F.R. §229.303(a)(3)(i)-(ii) and (b)(2).  The "Operating Results Fraud" included the following misstatements, which coincided with Defendants' significant insider sales and changes in employment statuses as shown in Appendix D.

109.    Higher One announced its Q2 2012 financial results in a series of filings made on August 7-9, 2012, including the following:

(a)    On August 7, 2012, Higher One issued a press release in which Defendant Volchek was quoted (the "8/7/2012 Press Release"), which was filed with the SEC as an exhibit to a Form 8-K signed by Defendant Volchek (the "8/7/2012 8-K"), announcing its financial and operating results for Q2 2012.  In them, Higher One reported GAAP net income of $4.1 million

and GAAP diluted earnings per share ("EPS") of $0.07 on revenue of $38.9 million (compared to revenue of $35.1 million in the same quarter a year before).  The 8/7/2012 Press Release stated, "The year-over-year revenue growth was primarily attributable to an increase in the number of OneAccounts and an increase in the number of higher education institutions that have contracted for its services."  It reported the number of OneAccounts at the end of Q2 2012 as 1.9 million accounts, up from 1.7 million at the end of Q2 2011.

(b)      Higher One's Q2 2012 10-Q, like the 8/7/2012 Press Release and 8/7/2012 8-K, reported net income of $4.1 million and diluted EPS of $0.07 on revenue of $38.9 million, compared to net income of $4.8 million and diluted EPS of $0.08 on revenue of $35.1 million in the same quarter a year before.

110.      Similarly, Higher One announced its Q3 2012 financial results in a series of filings made on November 6-8, 2012, including the following:

(a)      On November 6, 2012, Higher One issued a press release in which Defendant Volchek was quoted (the "11/6/2012 Press Release"), which was filed with the SEC as an exhibit to a Form 8-K signed by Defendant Volchek (the "11/6/2012 8-K"), announcing its financial and operating results for Q3 2012.  In them, Higher One reported GAAP net income of $7.3 million and GAAP diluted EPS of $0.13 on revenue of $51.2 million (compared to revenue of $48.1 million in the same quarter a year before).  In the 11/6/2012 Press Release, Defendant Volchek stated, "We continued to diversify our business, and we've made changes to the OneAccount suite that should help drive customer engagement and retention in the long-run."  The 11/6/2012 Press Release also reported the number of OneAccounts at the end of Q3 2012 as 2.1 million accounts, up from 2.0 million at the end of Q3 2011.

(b)      The Q3 2012 10-Q, like the 11/6/2012 Press Release and 11/6/2012 8-K, reported net income of $7.3 million and diluted EPS of $0.13 on revenue of $51.2 million, compared to net income of $8.4 million and diluted EPS of $0.14 on revenue of $48.1 million in the same quarter a year before.

111.      Higher One announced its Q4 2012 financial results in a series of filings made on February 12, 2013 and March 4, 2013, including the following:

(a)      On February 12, 2013, Higher One issued a press release in which Defendant Volchek was quoted (the "2/12/2013 Press Release"), which was filed with the SEC as an exhibit to a Form 8-K signed by Defendant Volchek (the "2/12/2013 8-K"), announcing its financial and operating results for Q4 2012 and calendar 2012.  In them, Higher One reported quarterly results of GAAP net income of $12.1 million and GAAP diluted EPS of $0.22 on revenue of $49.8 million (compared to revenue of $41.7 million in the same quarter a year before), and annual results of GAAP net income of $36.9 million and GAAP diluted EPS of $0.65 on revenues "at the high end of guidance" at $197.7 million.  The 2/12/2013 Press Release also reported the number of OneAccounts at the end of Q3 2012 as 2.0 million accounts, flat with Q4 2011.

(b)      The 2012 10-K, like the 2/12/2013 Press Release and 2/12/2013 8-K, reported Q4 2012 quarterly results of net income of $12.1 million and GAAP diluted EPS of $0.22 on revenue of $49.8 million, compared to net income of $7.6 million and diluted EPS of $0.13 on revenue of $41.7 million in Q4 2011, and reported 2012 annual results of GAAP net income of $36.9 million and GAAP diluted EPS of $0.65 on revenues on $197.7 million in revenues, as compared against GAAP net income of $31.9 million and GAAP diluted EPS of $0.54 on revenues of $176.3 million in calendar 2011.

112.    Higher One announced its Q1 2013 financial results in a series of filings made on May 7-10, 2013, including the following:

(a)    On May 7, 2013, Higher One issued a press release in which Defendant Volchek was quoted (the "5/7/2013 Press Release"), which was filed with the SEC as an exhibit to a Form 8-K signed by Defendant Volchek (the "5/7/2013 8-K"), announcing its financial and operating results for Q1 2013.  In them, Higher One reported GAAP net income of $9.8 million and GAAP diluted EPS of $0.20 on revenue of $57.4 million (compared to revenue of $57.8 million in the same quarter a year before).  The 5/7/2013 Press Release also reported the number of OneAccounts at the end of Q1 2013 as 2.2 million accounts up from 2.0 million at the end of Q4 2012.

(b)    Higher One's Form 10-Q for the quarter ended March 31, 2013, was filed with the SEC on May 10, 2013 (the "Q1 2013 10-Q") and was signed by Defendants Volchek and Wolf and SOX certified by Defendants Volchek and Wolf.  The Q1 2013 10-Q, like the 5/7/2013 Press Release and 5/7/2013 8-K, reported GAAP net income of $9.8 million and GAAP diluted EPS of $0.20 on revenue of $57.4 million, compared to net income of $13.4 million and diluted EPS of $0.23 on revenue of $57.8 million in the same quarter a year before.

113.    Higher One announced its Q2 2013 financial results in a series of filings made on August 8-9, 2013, including the following:

(a)    The 8/8/2013 Press Release and the 8/8/2013 8-K/A reported Higher One's GAAP net income of $3.6 million and GAAP diluted EPS of $0.07 on revenue of $40.0 million (compared to revenue of $38.9 million in the same quarter a year before).  The 8/8/2013 Press Release also reported the number of OneAccounts at the end of Q2 2013 as 2.2 million, flat from the end of Q1 2013 but up 14% from the end of Q2 2012.

(b)     Higher One's Form 10-Q for the quarter ended June 30, 2013, was filed with the SEC on August 9, 2013 (the "Q2 2013 10-Q") and was signed and SOX certified by Defendants Volchek and Wolf.  The Q2 2013 10-Q, like the 8/8/2013 Press Release and 8/8/2013 8-K/A, reported GAAP net income of $3.6 million and GAAP diluted EPS of $0.07 on revenue of $40.0 million, compared to net income of $4.1million and diluted EPS of $0.07on revenue of $38.9 million in the same quarter a year before.

114.    Higher One announced its Q3 2013 financial results in a series of filings made on November 7-8, 2013, including the following:

(a)     On November 7, 2013, Higher One issued a press release in which Defendant Volchek was quoted (the "11/7/2013 Press Release"), which was filed with the SEC as an exhibit to a Form 8-K signed by Defendant Wolf (the "11/7/2013 8-K"), announcing its financial and operating results for Q3 2013.  In them, Higher One reported GAAP net loss of $5.5 million and GAAP diluted loss per share of $0.11 on revenue of $57.1 million (compared to GAAP net income of $7.3 million and GAAP diluted EPS of $0.13 on revenue of $51.2 million in the same quarter a year before).  The 5/7/2013 Press Release also reported the number of OneAccounts at the end of Q3 2013 as 2.2 million accounts up 5% from Q3 2012.

(b)     In addition, Higher One's Q3 2013 10-Q, like the 11/7/2013 Press Release and 11/7/2013 8-K, reported GAAP net loss of $5.5 million and GAAP diluted loss per share of $0.11 on revenue of $57.1 million (compared to GAAP net income of $7.3 million and GAAP diluted EPS of $0.13 on revenue of $51.2 million in the same quarter a year before).

115.    Higher One announced its Q4 2013 financial results in a series of filings made on February 13, 2014, March 10, 2014, and April 4, 2014, including the following:

(a)     In the 2/13/2014 Press Release and the 2/13/2014 8-K, Higher One reported quarterly results of GAAP net income of $6.3 million and GAAP diluted EPS of $0.13 on revenue of $56.6 million (compared to GAAP net income of $12.1 million and GAAP diluted EPS of $0.22 on compared to revenue of $49.8 million in Q4 2013), and annual results of $211.1 million in revenues (compared to revenue of $197.7 million for calendar 2013).  The 2/12/2013 Press Release also reported the number of OneAccounts at the end of Q3 2012 as 2.2 million accounts, up 9% from Q4 2013.

(b)     The 2013 10-K and 2013 10-K/A, like the 2/13/2014 Press Release and 2/13/2014 8-K, reported Q4 2013 quarterly results of GAAP net income of $6.3 million and GAAP diluted EPS of $0.13 on revenue of $56.6 million (compared to GAAP net income of $12.1 million and GAAP diluted EPS of $0.22 on compared to revenue of $49.8 million in Q4 2013), and annual results of GAAP net income of $14.1 million and GAAP diluted EPS of 0.29 on $211.1 million in revenues (compared to GAAP net income of $36.9 million and GAAP diluted EPS of 0.65 on revenue of $197.7 million for calendar 2013).

116.     On May 8, 2014, Higher One issued a press release (the "5/8/2014 Press Release") that was filed with the SEC as an exhibit to a Form 8-K signed by Defendant Wolf (the "5/8/2014 8-K") announcing its financial and operating results for Q1 2014.  In them, Higher One reported GAAP net income of $9.7 million and GAAP diluted loss per share of $0.20 on revenue of $66.6 million (compared to GAAP net income of $9.8 million and GAAP diluted EPS of $0.20 on revenue of $57.4 million in the same quarter a year before).  The 5/8/2014 Press Release also reported the number of OneAccounts at the end of Q1 2014 as 2.3 million accounts, up 6% from Q1 2013.

117.    The foregoing statements in ¶¶109-116 were materially false and misleading because they reported revenues, net income, and earnings per share figures for Higher One without disclosing that these results were generated through improper and illegal activities, in violation of the 2012 FDIC Consent Order and applicable laws including FTC Act §5 and consumer protection laws, on such a large scale as to risk penalties and fines that would completely wipe them out, as happened when the FDIC and Federal Reserve handed down $60 million in fines and penalties in 2015, as described below, thereby wiping out *all* of Higher One's reported Class Period net income, as illustrated in Appendix C.  They also described an increase in the number of OneAccounts and credited such increase as driving reported results, without disclosing that the improper and illegal marketing and handling of those accounts, including, *inter alia*, concealment of their terms and charging of "hidden" and improper fees, as described by CW4, were done in violation of the 2012 FDIC Consent Order and applicable laws including FTC Act §5 and consumer protection laws, and without disclosing that the vast majority of fees generated by the OneAccounts were ill-gotten gains that Higher One was legally obligated to forfeit and repay in the form of restitution, fines, and penalties upon discovery of the misconduct by the FDIC and Federal Reserve – all for conduct that was strikingly similar to its pre-Class Period misconduct that led to the 2012 FDIC Consent Order and the Class Action Settlement, as illustrated in Appendix B.  These misstatements and omissions violated, *inter alia*, Regulation S-K, Item 303, 17 C.F.R. §229.303(a)(3)(i)-(ii) and (b)(2).

## The Truth Begins To Emerge

118.    The truth about Defendants' fraud was revealed in a series of partial corrective disclosures, which caused the inflation to be removed in stages from Higher One's stock price.

119.    After hours on May 12, 2014, Higher One filed with the SEC its Form 10-Q for the quarter ended March 31, 2014 (the "Q1 2014 10-Q"), which was signed and SOX certified by

CEO Sheinbaum and Defendant Wolf.  The Q1 2014 10-Q disclosed that Higher One faced penalties from the Federal Reserve relating to marketing and disclosure practices regarding its OneAccount product – the very issues for which it had been saddled with the 2012 FDIC Consent Order – regarding not one, but *two bank partners*. Moreover, it disclosed that the potential penalties were *severe enough that they could trigger a default on its Credit Facility, which at the time had $94 million in outstanding borrowings*.  Specifically, Higher One stated in part:

> On May 9, 2014, the Board of Governors of the Federal Reserve System, or the Board of Governors, advised us of its determination to seek an administrative order against us with respect to asserted violations of the Federal Trade Commission Act relating to our activities with both a former and current Bank Partner and our marketing and disclosure practices related to the process by which students may select the OneAccount option for financial aid refund.  We are in discussions with the Board of Governors in this matter.  Any administrative order arising out of this matter is likely to include demands for material customer restitution, material civil money penalties, and changes to certain of our business practices and could have a material adverse effect on our business, financial condition, and results of operations.  Although the ultimate amount of restitution or civil money penalties are subject to many uncertainties and therefore are impossible to predict, it is possible the amounts could reach levels that would cause an event of default under our Credit Facility.  While we believe that it is probable that we will have a loss related to this regulatory matter, in view of the inherent difficulty of predicting the outcome of regulatory matters, we cannot predict what the eventual outcome of this pending matter will be, what the timing of the ultimate resolution of this matter will be or the potential range of loss associated with this matter.  We are currently unable to estimate a range of loss associated with this matter because it is in an early stage.

120.   On this news, shares in Higher One's stock price fell $0.90, or over 14%, on heavy trading volume, to close at $5.51 on May 13, 2014, down from its prior day's closing price of $6.41.

121.   On May 14, 2014, Bloomberg News published an article before the market open regarding a Department of Education proposal to ban most account fees involved in the multimillion-dollar marketing deals between universities, banks, and companies like Higher One.

The article cited lawmakers and consumer groups that had argued for years that such contracts can expose students to unreasonably high fees for things like cash withdrawals or overdrafts – exactly the sort of misconduct perpetrated by Higher One.  In discussing the proliferation of contracts between financial institutions and education institutions, the article specifically cited Higher One's arrangements with colleges pursuant to which it helps manage the disbursement of federal aid into student accounts.  Under the heading "'Unfair' Practices," it also cited a letter from 24 lawmakers to the Department of Education telling it to "protect students from unfair banking practices" by banning fees on accounts receiving federal financial aid and publicizing bank contracts for student products, among other steps.

122.    On this news, shares in Higher One's stock price fell $0.44, or nearly 8%, on heavy trading volume, to close at $5.07 on May 14, 2014, down from its prior day's closing price of $5.51.

123.    In the wake of the revelations on May 13-14, 2014, Sadif Analytics published an analyst report on May 15, 2014, which, among other things identified the "negative outlook" on Higher One, described Higher One's financial risk in terms of both liquidity and market volatility as high, identified its volatility risk outlook as negative, and gave Higher One an SMR StockMarks rating of 37/100 while noting its recent revision downward with a month-to-month negative trend.  The report's conclusions characterized Higher One as an average long-term investment, noting Higher One's significant share price decline, its below average likelihood of outperforming the market, and the "well above average" market risk associated with holding its shares.

124.    On this news, shares in Higher One's stock price fell $1.26, or nearly 25%, on heavy trading volume, to close at $3.81 on May 15, 2014, down from its prior day's closing price of $5.07.

125.    More details regarding these partial corrective disclosures became available in July 2014.  On July 1, 2014, the Federal Reserve issued a press release detailing Higher One's wrongful conduct and detailing the penalties it faced, including restitution payments.  Per the Federal Reserve, Higher One engaged in "deceptive practices…that, at various points in the financial aid refund selection process, misled students about the OneAccount," including:

- The omission of material information about how students could get their financial aid refund without having to open a OneAccount;

- The omission of material information about the fees, features, and limitations of the OneAccount product, which may have made it more difficult for students to make fully informed decisions prior to selecting the method for financial aid refund disbursement;

- The omission of material information about the locations of ATMs where students could access their OneAccount without cost and the hours of availability of those ATMs; and

- The prominent display of the school logo, which may have erroneously implied that the school endorsed the OneAccount product.

126.    The same day, the State of Illinois, Department of Financial & Professional Regulation ("IDFPR") issued a press release likewise detailing Higher One's misconduct and resulting penalties.  It quoted the IDFPR Acting Secretary as saying, "It is unconscionable for any company to seek profit by misleading customers about the terms of their financial accounts."  It went on to spell out the wrongful conduct Higher One had perpetrated, involving the very same OneAccount that had been at issue in the 2012 FDIC Consent Order.  Specifically, the IDFPR said that "Higher One…had mislead students at various points in the financial aid process, including by:"

•       Failing to disclose on all relevant documents how students could access their financial aid payment without having to open an online "OneAccount." Higher One and Cole Taylor Bank benefited from students directing their financial aid payments to the OneAccount, instead of to an alternative bank account or paper check.  During the timeframe of IDFPR's consent order, approximately 440,000 new OneAccounts were opened at Cole Taylor.

•       Failing to disclose the fees, features, and limitations of the OneAccount. Higher One required unusual fees, such as a 50-cent fee for not using the debit card as a credit card and a fee of 3.5 percent for withdrawing cash at a bank teller.  Higher One earned income from all fees paid by students in connection with the accounts.  Cole Taylor received benefits from holding and deploying the funds held in the non-interest bearing accounts.

•       Failing to disclose information about the locations of ATMs where students could access their OneAccounts without incurring costs;  and

•       Prominently displaying the school logos, which may have erroneously implied the schools endorsed the OneAccount product.

127.    Both press releases contained links to the Order to Cease and Desist and Order of Assessment of a Civil Money Penalty Issued upon Consent Pursuant to the Federal Deposit Insurance Act and the Illinois Banking Act, as Amended, dated June 26, 2014 (the "2014 Federal Reserve Cease and Desist Order"), levied by the Federal Reserve against Cole Taylor and Higher One.  The 2014 Federal Reserve Cease and Desist Order explained the conduct at issue in even greater detail.  It explained that many types of financial aid funds are first distributed in full to a school, which deducts tuition and other amounts payable to the school itself, before needing to disburse the rest to students in what is called a "refund."  Refunds are typically processed via either a check or an automated clearing house (ACH" transfer to a student's existing bank account.  Higher One's OneDisburse service (a/k/a "Refund Management" service) permitted schools to outsource the financial aid refund disbursement process, to save time and costs. Higher One handled the process, and offered students direct deposit to its OneAccount products

(OneAccount, OneAccount Flex, OneAccount Edge, and OneAccount Premier), among other options.

128.    The 2014 Federal Reserve Cease and Desist Order also described how Higher One captured fees paid by students in connection with these OneAccount accounts, some of which were unusual, like a $0.50 fee for not using a debit card as a credit card and a 3.5% fee for accessing cash at a bank teller, in addition to interchange fees paid by merchants who accepted the debit cards.

129.    In this context, the 2014 Federal Reserve Cease and Desist Order made clear that Higher One controlled students' access to and information about financial aid refund disbursement options, because Higher One's website was used by students at colleges and universities participating in the OneAccount program to select the method of financial aid refund disbursement.  This setup triggered all the truthfulness, disclosure, and marketing obligations arising, *inter alia*, under FTC Act §5, the 2012 FDIC Consent Order, and Higher One's Code of Business Conduct, as described herein.

130.    Yet, the 2014 Federal Reserve Cease and Desist Order makes clear that Higher One ran gravely afoul of these obligations, constituting "acts or practices in or affecting commerce, within the meaning of section 5(a)(1) of the FTC Act (15 U.S.C. § 45(a)(1)), and unsafe or unsound banking practices."  As described by the Federal Reserve:

> The Higher One website and associated materials contained material omissions related to the OneAccount, which were likely to mislead students acting reasonably under the circumstances. Information about the fees, features, and limitations of the OneAccount was omitted entirely or was not clear and conspicuous. Examples of these omissions that were in effect during the Relevant Period included, but were not limited to:
>
> (i)    There was no information on the refund disbursement home page about the ACH transfer to another bank account and paper check options, either of

which may have enabled students to access their student financial aid refunds with fewer fees.

(ii)    On the web page where the student made a choice about the method of refund disbursement, information about the speed of receiving a refund through the OneAccount was readily available, but there was no information about the fees, features, and limitations of the OneAccount, which may have made it more difficult for students to make a fully informed decision prior to selecting the method for financial aid disbursement.

(iii)    Information about ATM locations was not available on the web page where the student made a choice about the method of refund disbursement. There was no information about the ATM hours of availability on any of the web pages, even though some ATMs were on campus locations that were in some cases closed on nights, weekends, and holidays.

(iv)    It was only at the final web page, after the student had entered all personal information, that a complete fee schedule and the terms and conditions were readily available for the student to view. The fee schedule contained information about ATM fees, but the student would need to click on another link to find information about ATM locations. There was no information on ATM hours of availability. If the student wanted to change his or her choice of refund delivery mechanism, the student would need to back out through previous screens to reach the starting web page

(v)    Although Cole Taylor is a bricks-and-mortar institution, there was no information on the website clarifying that the OneAccount was an Internet-based checking account.

(vi)    The website featured the school logo more prominently than the Higher One logo or the fine-print reference to Cole Taylor, which may have erroneously implied that the schools endorsed the OneAccount as the preferred method of disbursement of financial aid refunds.

131.    In an August 7, 2014 press release (the "8/7/2014 Press Release") filed with the

SEC as an exhibit to an 8-K on August 7, 2014 signed by Defendant Wolf (the "8/7/2014 8-K"),

Higher One disclosed that it had made an $8.7 million allowance for customer restitution.  The

8/7/2014 8-K appended slides that alarmingly set forth as follows:

- •    In discussions with Federal Reserve regarding potential restitution

- •    Recorded allowance of $8.75 million for restitution

- Potential exposure of $35 million for Federal Reserve bank partner customers

- Additional potential exposure of $35 million for FDIC bank partner customers

- Uncertain of timing

132.   The same day, also on August 7, 2014, Higher One held an earnings call with analysts and investors (the "8/7/2014 Earnings Call"), on which Defendant Wolf, CEO Sheinbaum, and McGuane participated.   During this call, they disclosed the utterly massive scope of Higher One's potential liabilities related to the misconduct underlying the fraud alleged herein:

(a)   During prepared remarks, CEO Sheinbaum disclosed a whopping *$70 million potential liability*, extending to all of Higher One's bank partners, both those regulated by the Federal Reserve *and* those regulated by the FDIC:

> Let me spend a few minutes discussing the regulatory environment. As many of you know, in early May, the staff of the Board of Governors of the Federal Reserve notified us that they intended to recommend that the Board of Governors seek an administrative order against the company with respect to asserted violations of the Federal Trade Commission act. The cited violations relate to our activities with both a former and current bank partner, and our marketing and disclosure practices related to the process by which students may select the OneAccount option for Financial Aid refund. ***During this quarter, we recorded a liability of $8.75 million related to this matter, which is shown as an allowance for customer restitution on our consolidated statement of operations. There is a reasonable possibility that the liability related to this matter will increase in future periods. In fact, the staff of the Board of Governors has asserted that any administrative orders may seek damages, including customer restitution and civil money penalties, totaling as much as $35 million and changes to certain of our business practices.*** We are in discussions with the staff of the Board of Governors and the Federal -- and the Reserve Bank on this matter. ***Approximately 55% of the OneAccounts are held at our bank partner regulated by the FDIC. And we will need to consider providing restitution voluntarily to those OneAccounts. In the event we do provide restitution to these OneAccounts on the same basis as an order from the Board of Governors of the Federal Reserve, it is reasonably possible that our loss related to this matter will increase accordingly, and increase our total exposure by an additional amount of approximately $35 million or approximately $70 million in total.***

(b)    During prepared remarks, Defendant Wolf disclosed the grave risks that Higher One faces under its Credit Facility:

> Let me cover the impact of the pending regulatory matters on our credit facility and liquidity sources. As Marc mentioned, we recorded an allowance for potential customer restitution of $8.75 million during the quarter. This charge reduces our EBITDA based on the definitions in our credit facility although the ultimate amount of restitution or civil money penalties are subject to many uncertainties and, therefore, impossible to predict. ***It is reasonably possible that amounts could reach levels that could cause an event to default under the credit facility. In addition to the $50 million minimum EBITDA threshold, a settlement with regulatory authorities exceeding $10 million could cause a default under the other covenants in the credit facility.*** We believe that our cash flows from operations, together with existing liquidity sources, will be sufficient to fund our operations and anticipated capital expenditures over the next 12 months. ***However, it is possible the amounts that we are required to pay related to these regulatory matters could reach levels that would exceed our available cash flows from operations and existing liquidity sources available through our credit facility. In that case, we would seek additional forms of financing or other sources of liquidity to supplement our existing liquidity sources. It is possible that the charge could be of such magnitude that it would cause an event to default under our credit facility.*** In the event of a default, depending on the amount loss, we believe that we may be able to obtain relief under certain of our current covenants. However, there can be no assurance we would receive an amendment or a waiver. If there is an event of default under our credit facility, the amounts then outstanding may be immediately due and payable. In such an event, we may seek -- we may need to seek alternative forms of financing or other sources of liquidity in order to repay the amount outstanding under our credit facility, but there can be no assurances that such alternative forms of financing or other sources of liquidity would be available to us on favorable terms or at all.

133.    On this news, Higher One's stock price fell $0.43, or 10.4%, on high volume, from its August 6, 2014 closing price of $4.14 to close at $3.71 on August 7, 2014.

134.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Higher One's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## ADDITIONAL POST-CLASS PERIOD REVELATIONS

135.    Additional post-Class Period revelations have shed light on the nature and scope of Higher One's Class Period misconduct, the nature and scope of Defendants' Class Period fraud, and the serious ramifications of both for Higher One and its shareholders.

**Regulators Impose A $55 Million Restitution Obligation To 1,325,000 Harmed Consumers And $4.46 Million In Penalties On Higher One For Misconduct With Three Partner Banks**

136.    In its Form 10-Q for the period ending June 30, 2014, which was filed with the SEC on August 8, 2014 (the "Q2 2014 10-Q"), which was signed and SOX certified by Defendant Wolf and CEO Sheinbaum, Higher One reiterated the disclosures from the 8/7/2014 Earnings Call, disclosing that it had recorded a reduction of its revenues of $8.75 million during the three months ended June 30, 2014 – as a minimum allowance for customer restitution – as a result of an ongoing regulatory examination.  The Q2 2014 10-Q described the risk faced by Higher One as follows, making clear that its exposure could extend not only to its Federal Reserve-regulated bank partners but also its FDIC-regulated bank partners and could reach $70 million:

> The allowance for customer restitution reduced our revenue and trailing twelve month EBITDA by $8.75 million during the quarter ended June 30, 2014.  If there is any event of any default under our credit agreement, all amounts then outstanding may be immediately due and payable and may require us to apply all of our available cash to repay these amounts. We may also need to seek alternative forms of financing or other sources of liquidity in order to repay these amounts. There can be no assurances that such alternative forms of financing or other sources of liquidity would be available to us on favorable terms or at all. The acceleration of indebtedness under our credit agreement could have a material adverse effect on our business, financial condition and results of operations.

> * * *

> On May 9, 2014, the Federal Reserve Banks of Chicago (the responsible Reserve Bank for a former bank partner) and Philadelphia (the responsible Reserve Bank for a current bank partner) notified us that the staff of the Board of Governors of the Federal Reserve System intended to recommend that the Board of Governors

of the Federal Reserve System, or the Board of Governors, seek an administrative order against us with respect to asserted violations of the Federal Trade Commission Act. The cited violations relate to our activities with both a former and current bank partner and our marketing and disclosure practices related to the process by which students may select the OneAccount option for financial aid refund. We are in discussions with the Staff of the Board of Governors and the Reserve Banks on this matter. The Staff of the Board of Governors has asserted that any administrative order may seek damages, including customer restitution and civil money penalties, totaling as much as $35 million, and changes to certain of our business practices.

Approximately 55% of the OneAccounts are held at our bank partner regulated by the FDIC and we will need to consider voluntarily providing restitution to those OneAccounts held at that bank partner. In the event we do provide restitution to these OneAccounts on the same basis as an order from the Board of Governors, it is reasonably possible that our loss related to this matter will increase accordingly and increase our total exposure by an additional amount of approximately $35 million, or approximately $70 million in total.

During the quarter ended June 30, 2014, we recorded a liability of $8.75 million related to this matter, which is shown as an allowance for customer restitution on our consolidated statement of operations.  While we believe that it is probable that we will have a loss related to this regulatory matter, in view of the inherent difficulty of predicting the outcomes of regulatory matters, we cannot predict the eventual outcome of this pending matter, the timing of the ultimate resolution of this matter or an exact amount of loss associated with this matter.  The liability recorded at June 30, 2014 reflects the minimum amount we expect to pay related to this matter, although, there is a reasonable possibility that the liability will increase in future periods.

137.    Higher One was ***forced to renegotiate its credit facility on extremely unfavorable terms***.  Higher One's lenders agreed, *inter alia*: (a) to exclude up to $75 million in income statement charges for regulatory penalties from required EBITDA ratio computations; (b) to revise the financial covenants of the credit facility; and (c) to permit a settlement payment of up to $75 million without triggering the "Judgments" provision in the "Events of Default."  ***Only through these machinations did Higher One avoid a default***.  However, this relief came at a high price.  Higher One was forced by its lenders, *inter alia*: (a) to pay down its credit line by $35 million, thereby greatly reducing its cash to just $15 million by the end of Q1 2015; (b) to

agree to reduce the borrowing limits of its $200 million credit facility, first to $140 million (with only $35 million available for resolution of regulatory matters), then to $130 million by December 31, 2015, then to $120 million by December 31, 2016; and (c) to incur *$4.5 million in fees*. These revised terms were announced in a Form 8-K signed by CEO Sheinbaum and filed with the SEC on February 29, 2015 (the "2/19/2015 8-K"), and as set forth in the Master Reaffirmation and Amendment No. 3 to Loan Documents ("2015 Revised Credit Agreement") filed with the SEC as an exhibit to Higher One's Form 10-K for the year ended December 31, 2014 (the "2014 10-K"), which was signed, *inter alia*, by CEO Sheinbaum and Defendants Volchek, Lasater, Wolf, and McFadden.

138.    On October 27, 2015, Higher One filed its Form 10-Q for the quarter ended September 30, 2015 (the "Q3 2015 10-Q"), which was signed and SOX certified by Defendant Wolf and CEO Sheinbaum.   It disclosed that, during Q3 2015, Higher One recorded an additional charge of $21.9 million, bringing its then-total "minimum" liability related to the misconduct at issue to $30.6 million, recorded as an allowance for customer restitution on its condensed consolidated statement of operations and as accrued expenses on its condensed consolidated balance sheets.  By this point, Higher One's stock remained substantially depressed, closing at $2.85 on October 27, 2015.

139.    On December 23, 2015, Higher One filed a Form 8-K signed by CEO Sheinbaum (the "12/23/2015 8-K"), disclosing imposition of Orders by the FDIC and Federal Reserve regarding Higher One's Class Period misconduct as alleged herein, which imposed on Higher One an aggregate *$55 million restitution obligation to 1,325,000 harmed consumers* and *$4.46 million in civil monetary penalties*.  These numbers are incredibly significant, inasmuch as they quantify the truly massive scale of Higher One's Class Period fraud as having affected <u>*22 times*</u>

***the number of consumers*** that had been at issue in the 2012 FDIC Consent Order and affected

roughly ***70% of the total OneAccounts*** open during the Class Period.  Specifically, Higher One

described these orders as follows:

(a)     Regarding the Federal Reserve's Order to Cease and Desist and Order of

Assessment of Civil Monetary Penalty Issued Upon Consent Pursuant to the Federal Deposit

Insurance Act, as Amended (the "2015 Federal Reserve Consent Order"), dated December 23,

2015, Higher One stated:

> On December 23, 2015, the Board of Governors of the Federal Reserve System
> (the "Federal Reserve Board") issued to Higher One, Inc. ("Higher One"), a
> wholly-owned subsidiary of Higher One Holdings, Inc. (the "Company"), an
> Order to Cease and Desist and Order of Assessment of Civil Money Penalty
> Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as
> Amended…, related to the Federal Reserve Board matter previously disclosed in
> the Company's Form 10-K and Form 10-Q filings.  Pursuant to the terms of
> the…Order, Higher One is required to, among other things: (1) continue to ***take
> all action necessary to correct all violations previously cited by the Federal
> Reserve Board and prevent the recurrence of similar violations***; (2) ***submit*** to
> the Philadelphia Reserve Bank ***an acceptable written plan to enhance the
> consumer compliance risk management program to ensure that the marketing,
> processing, and servicing of student financial aid-related deposit or loan
> products or services by Higher One comply with all consumer protection laws
> and regulations***; (3) ***deposit $24,000,000 into a qualified settlement fund for
> purposes of  providing restitution*** of certain OneAccount fees to consumers, as
> provided by the…Order, and submit to the Philadelphia Reserve Bank an
> acceptable written plan to provide for the restitution; and (4) ***pay a civil money
> penalty of $2,231,250***.

(b)     Regarding the FDIC's Consent Order, Order for Restitution and Order to Pay

Civil Monetary Penalty ("the "2015 FDIC Consent Order"), dated December 23, 2015, ***which***

***related to the same misconduct as the 2012 FDIC Consent Order and expressly superseded it***,

Higher One stated:

> Also on December 23, 2015, the Federal Deposit Insurance Corporation ("FDIC")
> issued to Higher One a Consent Order, Order for Restitution and Order to Pay
> Civil Money Penalty…related to the FDIC matter previously disclosed in the
> Company's Form 10-K and Form 10-Q filings. Pursuant to the terms of the…

Order, Higher One is required to, among other things: (1) continue to **correct and eliminate all violations of law previously cited by the FDIC and prevent the recurrence of similar violations**; (2) **review its Compliance Management System as it relates to its student financial aid-related deposit or loan products and revise, develop and/or implement changes as necessary to ensure such products and services comply with all applicable consumer protection laws**; (3) **deposit $31,000,000** into a segregated deposit account **for the purpose of providing restitution** of certain OneAccount fees to consumers, as provided by the… Order; and **submit** to the Regional Director of the FDIC for non-objection **a plan to provide restitution**; and (4) **pay a civil money penalty of $2,231,250**.  Concurrent to Higher One entering this…Order, the FDIC lifted the August 7, 2012 Consent Order previously disclosed in the Company's Form 10-K and Form 10-Q filings.

140.    Also on December 23, 2015, an FDIC press release announced its Consent Orders with Higher One and partner bank WEX Bank for violations of FTC Act §5 **spanning from May 4, 2012 through July 15, 2014** – nearly the **entire Class Period at issue in this litigation**. Significantly, Higher One's misconduct at issue in these Consent Orders overlaps with its misconduct at issue in the 2012 FDIC Consent Order, the consumer class actions, the 2014 Federal Reserve Cease and Desist Order, and the 2015 Federal Reserve Consent Order, as illustrated on Appendix A hereto, such that Higher One literally had **never** operated legally as a public company.

141.    The 2015 FDIC Consent Order stated that the FDIC had determined that Higher One violated FTC Act §5 – **throughout the Class Period at issue in this litigation** – by its marketing and enrollment of consumers into OneAccounts.  Specifically, the FDIC found that Higher One's website: (a) featured school logos more prominently than its own or those of partner banks; (b) lacked information on the refund disbursement home page about alternatives to the OneAccount; (c) prominently touted the speed of a OneAccount refund while omitting information about its fees and other limitations; (d) omitted information about the availability of fee-free ATMs on the page where students chose their refund method and failed to notify students that OneAccounts were Internet-only; and (e) failed to display a complete fee schedule

until after students had selected their refund delivery choice and entered all personal information and made students click another link to find information about the location of fee-free ATMs. Higher One finally sent the omitted information to students on July 15, 2014, the end date of the Consent Order.  However, the FDIC found that, by that point, ***over 755,000*** of the 978,500 ***new One Accounts opened with Higher One's FDIC-regulated banking partner WEX Bank had already been assessed improper fees*** of the kinds that Higher One used to illegally profit from OneAccounts: (a) cash advance fees; (b) merchant PIN-based debit transaction fees; (c) non-Higher One ATM transaction fees; (d) delinquent account fees; (e) cash deposit fees; (f) abandoned account fees; (g) lack of documentation fees; and (h) improperly disclosed uncategorized fees.

142.    The 2015 FDIC Consent Order imposed severe penalties on Higher One, including payment of ***$31 million for restitution*** to customers who opened a OneAccount at WEX Bank between May 4, 2012 and December 19, 2013 and incurred improper fees between May 4, 2012 and July 15, 2014.  It also imposed a ***civil monetary penalty of $2.23 million*** on Higher One.  The FDIC also ordered Higher One to cease and desist improper conduct and violations of law.  It ordered Higher One to implement within 60 days procedures to prevent a recurrence of improprieties with OneAccounts or any student financial aid-related consumer deposit or lending product or service.  It ordered Higher One to take all action necessary to eliminate any violations of FTC Act §5, including refraining from further misrepresentations or omissions.  It mandated Board and senior management oversight to ensure compliance and required implementation within 90 days of an effective Compliance Management System.

143.    The FDIC's simultaneous Consent Order, Order for Restitution, and Order to Pay Civil Money Penalty with Higher One's banking partner, WEX Bank (the "2015 FDIC WEX

Consent Order"), also dated December 23, 2015, imposed similarly harsh conditions on its banking partner, WEX Bank.  The FDIC also ordered WEX Bank to cease and desist improper conduct and violations of law.  It also required WEX Bank to backstop Higher One's $31 million restitution payment and assessed WEX Bank a *$1.75 million civil monetary penalty*.

144.    Also on December 23, 2015, the Federal Reserve Board issued a press release announcing the 2015 Federal Reserve Consent Order with Higher One for deceptive practices in violation of FTC Act §5, regarding its work with partner banks Cole Taylor Bank and Customers Bank, *spanning May 4, 2012 through July 7, 2014* – once again, nearly the *entire Class Period at issue in this litigation*.  Higher One's misconduct at issue in the 2015 Federal Reserve Consent Order also overlaps with its misconduct at issue in the 2012 FDIC Consent Order, the consumer class actions, the 2014 Federal Reserve Cease and Desist Order, and the 2015 FDIC Consent Order, as illustrated on Appendix A hereto, such that Higher One literally had *never* operated legally as a public company.

145.    The 2015 Federal Reserve Consent Order set forth its finding that Higher One violated FTC Act §5 by deceptively marketing the OneAccount.  Like the FDIC, the Federal Reserve found Higher One's marketing contained material omissions about OneAccount fees, features, and limitations likely to mislead consumers, *e.g.*, Higher One's website: (a) lacked any information on its refund disbursement page as to alternatives to the OneAccount that would let students access funds with fewer or no fees; (b) lacked information about locations of fee-free ATMs on the page where students chose refund disbursement methods and omitted information about the hours of such ATMs (many of which closed at certain times) on any pages; (c) failed to display a complete fee schedule until after students selected a refund delivery choice and entered all personal information and made students click another link to find information about fee-free

ATM locations; (d) failed to disclose that the OneAccount was Internet-only; and (e) featured school logos more prominently than those of Higher One or partner banks, implying school endorsements of the OneAccount as a preferred refund method.  Higher One finally sent the omitted information to students on July 7, 2014.  By that point, however, the Federal Reserve, like the FDIC, found that ***approximately 570,000*** of the 850,000 ***new OneAccounts opened at Cole Taylor and Customers had already been assessed improper fees*** of the kinds that Higher One used to illegally profit from OneAccounts:  (a) a $0.50 fee for using the OneAccount-linked debit card as a point-of-sale purchase executed through entry of a PIN number rather than a signature like a credit card; (b) a 3.5% "cash advance" fee for withdrawing funds from a bank teller; (c) non-Higher One ATM transaction fees; (d) abandoned account fees; (e) delinquent account fees; (f) cash deposit fees; (g) lack of documentation fees; and (h) improperly disclosed uncategorized fees.

146.    Like the FDIC, the Federal Reserve imposed severe penalties on Higher One, including payment of ***$24 million for restitution*** to customers who opened a OneAccount at Cole Taylor or Customers Bank between May 4, 2012 and December 19, 2013 and incurred improper fees between May 4, 2012 and July 7, 2014.  It also imposed a ***civil monetary penalty of $2.23 million*** on Higher One.  The Federal Reserve also ordered Higher One to cease and desist improper conduct and violations of law and to refrain from further misrepresentations and omissions.  It ordered Higher One to submit within 90 days a written consumer compliance plan to ensure compliance with FTC Act §5 and to prevent recurrence of the misconduct, including enhanced training, internal controls, and oversight by senior compliance and risk personnel and by partner banks, which was to be implemented within 10 days of approval by the Philadelphia Reserve Bank.

**Ordered To Reform And To Forego Illegal Fees, And With Its Stock Price Gutted,
Higher One Admits Its Business Model Is Unsustainable And Sells Itself Off In Pieces**

147.     In the face of these crushing obligations and penalties imposed by the FDIC and Federal Reserve, to raise capital, Higher One sold its Campus Labs data analytics business, which had enjoyed 21% compounded annual revenues growth since it was acquired in 2012. The sale was announced in a press release dated October 19, 2015 (the "10/19/2015 Press Release") filed as an attachment to a Form 8-K (the "10/19/2015 8-K") and in a press release dated November 27, 2015 (the "11/27/2015 Press Release") filed as an attachment to a Form 8-K (the "11/27/2015 8-K").   The $87 million closing price included a $30 million payment on Higher One's behalf to reduce amounts outstanding on its renegotiated credit facility.

148.     Higher One also agreed to sell its proprietary refunds disbursement business, including its OneAccounts, to its bank partner, Customers Bank, subject to a four-year non-compete agreement, for $37 million ($17 million at closing and $10 million on each of the first two anniversaries of the closing) and 35% of annual gross revenues (if any) in excess of $75 million generated by the business in 2017, 2018, or 2019.   This sale was announced in a press release dated December 15, 2015 (the "12/15/2015 Press Release") and a December 16, 2015 slide presentation (the "12/16/2015 Slides"), both filed as attachments to a December 15, 2015 Form 8-K (the "12/15/2015 8-K") and a Form DEFA14A (the "12/17/2015 DEFA14A").

149.     Significantly, however, *Higher One maintained responsibility for the FDIC and Federal Reserve penalties*, as stated in a conference call transcript (the "12/16/2015 Teleconference") filed as an attachment to the DEFA14A and a Form 8-K filed with the SEC on December 17, 2015 (the "12/17/2015 8-K").   During the call, Higher One CEO Sheinbaum explained the decision to sell the refunds disbursement business, and in doing so, admitted that

without the ability to charge improper fees on its OneAccounts due to heightened regulatory scrutiny, Higher One's business model was unsustainable.  Specifically, he said in relevant part:

> *All of this heightened scrutiny on both Higher One and our bank partners have led us to believe that* <u>*our current model*</u> *of being a third-party servicer at the banks* <u>*will not be sustainable going forward*</u>.  Our concern has increased over the past few weeks as we have been discussing potential actions with the FDIC, the Federal Reserve, and our bank partners.  If either of our current bank partners were to exit our existing relationship, we now believe it is doubtful that Higher One would be able to attract alternative banks to participate in our program going forward.

150.    In the face of that reality, Higher One's stock price never recovered to its Class Period average.  From August 7, 2014 onward, it traded between $1.88 and $5.15.

151.    Higher One ultimately agreed to sell off what remained of itself to Blackboard, Inc. in a deal that closed on August 5, 2016.  Higher One shareholders received just $5.15 per share, a paltry amount compared against its Class Period high of $13.59.   An analysis of comparable deals on Bloomberg reveals that the metrics of the Higher One sale evidence that it was a sale done under duress.  For instance, the ratio of total value to revenue of 1.52 compared unfavorably against the median ratio of 5.05, the ratio of total value to book value of 2.17 compared unfavorably against the median ratio of 3.13, and the ratio of equity to net income plus depreciation of 8.71 compared unfavorably against the median ratio of 15.66.

152.    This selloff completed the process of shareholder value destruction that was the direct and proximate result of Defendants' fraud as alleged herein.  Today, there is no Higher One, and its defrauded shareholders, Plaintiffs and the Class members, are left with losses that they can only hope to recover via this lawsuit.

## ADDITIONAL FACTS PROBATIVE OF SCIENTER

### Defendants' Knowledge or Reckless Disregard of Red Flags Demonstrates Scienter

153.    The 2012 FDIC Consent Order, the Class Action Settlement, the 2014 Federal Reserve Cease and Desist Order, 2015 FDIC Consent Order, and the 2015 Federal Reserve Cease and Desist Order address substantially the *same misconduct*, during *overlapping time periods*, that altogether demonstrate that Higher One operated for *seven years straight* *without any window of legal compliance* – including the *entire time* it was a public company – and that its liability from this misconduct exceeded *all* of its Class Period net income.  The *only sensible inference* is that Defendants, having been put on notice as to Higher One's pre-Class Period misconduct by the 2012 FDIC Consent Order and the consumer class actions that resulted in the Class Action Settlement and having been required to halt it after paying $26 million, were as they engaged in massive insider sales, *aware* that such misconduct nevertheless continued unabated, with *three* separate bank partners, one of whom raised concerns and prematurely terminated the relationship, on a scale that ultimately cost Higher One over *$60 million*, its banking relationships, its ability to conduct business, and as a result, its existence as an independent company.

154.    The CWs attest to Defendants' direct knowledge as to key aspects of the fraud at issue.  CW4, Higher One's Chief Information Officer during the Class Period who reported directly to Defendants Volchek and Lasater, said that Defendant Lasater led Higher One's work related to the 2012 FDIC Consent Order, decided what changes to make and what changes would not be made, and wanted to do less, slower.  CW5 said that Defendants Volchek and Lasater relied on Higher One's VP of Banking, Clark, with whom they met, to lead its banking department and that Clark refused to follow new banking procedures, told employees that

banking rules and regulations did not apply to Higher One, and refused to alter existing policies when CW5 pointed out problems. CW5 said that Defendants Volchek and Lasater led monthly all-hands-on-deck meetings at Higher One, and that Defendant Lasater attended meetings where compliance issues were discussed. CW3 said that Defendant Wolf was "very involved" in Higher One's day-to-day operations and observed Wolf exert new oversight of human resources that had not existed prior to his tenure. CW4 said that, after Cole Taylor expressed concern about Higher One's practices early on in its partnership, Defendants Volchek and Lasater participated in direct conversations with Cole Taylor over a period of three to six months, during which Cole Taylor expressed concerns, including regarding Higher One's website marketing, before providing 30- or 60-day notice of termination and then terminating its relationship with Higher One.

155.    In addition, the mechanisms for Defendants' knowledge, more broadly, are clear. The quarterly filings during the Class Period referenced above all contained statements identical or substantially similar to the following:  "Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended, or the Exchange Act) as of March 31, 2013."  Thus, at least each quarter during the Class Period, Defendant Volchek, Defendant Lasater, Defendant Wolf (once he assumed his position as CFO), and Defendant Wallace (at least during such time as he was filling interim CFO duties and SOX certifying public filings) certified that they had assessed the sufficiency of Higher One's internal controls.

156.    Moreover, as the individuals who signed the SOX certifications accompanying Higher One's Q2 2012 10-Q, Q3 2012 10-Q, 2012 10-K, Q1 2013 10-Q, Q2 2013 10-Q, Q3

2013 10-Q, and 2013 10-K, Defendants Volchek, Wallace, and Wolf expressly certified as to their responsibility for establishing and maintaining Higher One's internal controls and further certified that they had designed those controls, or caused them to be designed, to ***ensure*** that material information regarding Higher One was made known to them, thus ensuring that they had actual knowledge of the facts and circumstances alleged above, or if they lacked such knowledge, that they lacked it only due to their reckless disregard of red flags raised by the facts and circumstances alleged above.  Specifically, their certifications attested as follows:

> The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared; …
>
> (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

157.   In addition, 2012 FDIC Consent Order ¶2(d) mandated that Higher One implement a compliance audit component, which it deemed "necessary to ensure an effective and independent review of its internal policies and procedures and compliance with Consumer Protection laws," and that it implement policies, procedures, and processes that ensure:  (i) independent and adequate audit practices and procedures consistent with GAAP; (ii) completion of a compliance audit plan each calendar year that is reviewed and approved by Higher One's Board; (iii) annual risk assessments to ensure compliance audits are conducted with reasonable frequency; (iv) "assignment of ratings or expressions of opinion as to the adequacy,

effectiveness, and efficiency of the internal control environment and compliance audit findings, deficiencies, and recommendations relating to a Product or Service, as documented in a written report and provided to the Audit Committee of the Board, together with a report of the Committee's actions in response to the audit, including where applicable an explanation why a recommendation has not been implemented; and (v) provisions for an adequate formal tracking and monitoring system for exceptions that are identified through compliance audits or regulatory examinations.

158.    Thus, Defendants, as well as other Higher One insiders who served as executive management or on Higher One's Board of Directors or the Audit Committee thereof, had actual knowledge of the facts and circumstances alleged above, or if they lacked such knowledge, then they lacked it only due to their reckless disregard of red flags raised by the facts and circumstances alleged above.  As disclosed in Higher One's Def 14A filings with the SEC during the Class Period, Defendant Volchek, Defendant Lasater (Chairman), Defendant Hatton (former CEO), and Defendant McFadden served on its Board and its Audit Committee. As disclosed on Higher One's corporate website, Casey McGuane was its Chief Service Officer throughout the Class Period.  As disclosed in Higher One's SEC filings, Lightyear Capital LLC, through its affiliates Lightyear Fund II, L.P. and Lightyear Co-Invest Partnership II, L.P. (altogether "Lightyear"), and acting through its member on Higher One's Board, Stewart Gross, was at all relevant times one of Higher One's largest shareholders, with over a 10% stake in the company.

159.    Defendants and these insiders, who as noted below engaged in significant insider sales during the Class Period, had access to information, and a duty to inquire, regarding the true state of Higher One's business operations, including as regarded its compliance with legal obligations including, *inter alia*, those arising from the 2012 FDIC Consent Order, its 2010 Code

of Business Conduct, and FTC Act §5 and all other applicable laws, including consumer protection laws.

160.    As established by the foregoing, Defendants, by virtue not only of their positions at Higher One, including their responsibilities at Higher One as described in their corporate biographies and Higher One's SEC filings, but also their actual receipt of information reflecting the true facts regarding Higher One, their control over and/or receipt of its materially misleading misstatements and omissions as alleged above, and their having signed or been quoted in or SOX certified the SEC filings and other documents containing those misstatements and omissions as discussed herein, all of which made them privy to confidential proprietary information concerning Higher One, participated in the fraudulent scheme alleged herein.   In addition, Defendants' knowledge included awareness of the existence of pervasive regulatory compliance issues and material weaknesses which resulted in materially inaccurate reported financial results.

### Suspicious, Widespread Insider Trading During the Class Period Evidences Scienter

161.    Defendants' scienter is further evidenced by the Class Period stock sales of Defendants and other insiders.  The conduct at issue took three forms – alterations to Rule 10b5-1 stock trading plans to increase sales of Higher One stock, exercises of Higher One stock options, and actual sales of Higher One stock – all of which were *highly suspicious in timing* when viewed against the alleged misstatements at issue and Defendants' suspect employment status changes (as illustrated by Appendix D submitted herewith) and *highly suspicious in amount* when viewed against their pre-Class Period holdings of both stock (as illustrated by Appendix E submitted herewith) and options (as illustrated by Appendix F submitted herewith).

162.    First, Defendants and other insiders altered their 10b5-1 stock trading plans during the Class Period, which they have conceded they did so as to permit them to increase sales of Higher One stock.   Specifically, the following changes were made:

(a)    Defendant Volchek, Higher One's CEO, changed his 10b5-1 trading plan on or about August 23, 2012 and on or about February 21, 2013;

(b)    Defendant Lasater, Higher One's President and COO, changed his 10b5-1 trading plan on or about February 21, 2013;

(c)    Defendant Hatton, who served as Higher One's President and CEO from 2002 to June 2012 and who served as a Higher One Director from March 2002 through the Class Period, changed his 10b5-1 trading plan on or about August 13, 2012;

(d)    McGuane, Higher One's Chief Service Officer, changed his 10b5-1 trading plan on or about August 17, 2012;

(e)    Robert Reach, Higher One's Chief Sales Officer, changed his 10b5-1 trading plan on or about August 23, 2012 and on or about February 20, 2013; and

(f)    Lightyear, one of Higher One's largest shareholders with a member on its Board of Directors (Stewart Gross), changed its 10b5-1 trading plan on or about September 7, 2012.

163.    Second, Defendants and other insiders engaged in massive Class Period sales, suspicious in timing and amount, many as the direct result of the changes made to their 10b5-1 trading plans, accumulating millions of dollars in ill-gotten gains from Higher One stock sales at prices inflated by the fraud alleged herein.   Specifically, such sales included the following, which are remarkable for their number, quantity, timing, and atypicality:

(a)      Defendant Volchek Class Period Sales

| Transaction Date | Higher One Purchases/ Sales | Shares | Price | Funds Spent / Gained |
|---|---|---|---|---|
| 02/20/2013 | Exercise of Option | 75,000 | $0.2900 | ($21,750) |
| 04/21/2014 | Exercise of Option | 75,000 | $0.6700 | ($50,250) |
| | | | | |
| **Sub-Total Option Shares** | | **150,000** | **Cost** | **($72,000)** |
| | | | | |
| 05/08/2013 | 10b5-1 Sale | (1,367) | $10.5000 | $14,354 |
| 05/14/2013 | 10b5-1 Sale | (38,633) | $10.5000 | $405,647 |
| 06/07/2013 | 10b5-1 Sale | (2,568) | $10.5000 | $26,964 |
| 06/11/2013 | 10b5-1 Sale | (37,432) | $10.5600 | $395,282 |
| 07/09/2013 | 10b5-1 Sale | (40,000) | $10.9800 | $439,200 |
| 08/06/2013 | 10b5-1 Sale | (40,000) | $10.7300 | $429,200 |
| 11/18/2013 | 10b5-1 Sale | (9,798) | $10.5000 | $102,879 |
| 11/19/2013 | 10b5-1 Sale | (14,308) | $10.5200 | $150,520 |
| | | | | |
| **Sub-Total 10b5-1 Sales** | | **(184,106)** | **Proceeds** | **$1,964,045** |
| | | | | |
| **Totals** | **Shares Purchased** | **0** | **Transaction Costs** | **$0** |
| | **Acquired By Options** | **+150,000** | **Transaction Costs** | **-$72,000** |
| | **Shares Sold** | **-184,106** | **Transaction Proceeds** | **+$1,964,045** |
| | | | **Net Gain to Defendant Volchek** | **+$1,892,045** |

(b)      Defendant Lasater Class Period Sales

| Transaction Date | Higher One Purchases/ Sales | Shares | Price | Funds Spent / Gained |
|---|---|---|---|---|
| 02/20/2013 | Exercise of Option | 75,000 | $0.2900 | ($21,750) |
| 04/22/2013 | Exercise of Option | 75,000 | $0.6700 | ($50,250) |
| | | | | |
| **Sub-Total Option Shares** | | **150,000** | **Cost** | **($72,000)** |
| | | | | |
| 05/08/2013 | 10b5-1 Sale | (400) | $10.5000 | $4,200 |
| 05/14/2013 | 10b5-1 Sale | (30,000) | $10.5400 | $316,200 |
| 06/12/2013 | 10b5-1 Sale | (2,525) | $10.6300 | $26,841 |
| 06/13/2013 | 10b5-1 Sale | (27,475) | $10.5100 | $288,762 |
| 07/11/2013 | 10b5-1 Sale | (30,000) | $11.0800 | $332,400 |
| 11/18/2013 | 10b5-1 Sale | (7,980) | $10.5100 | $83,870 |
| 11/19/2013 | 10b5-1 Sale | (16,200) | $10.5200 | $170,424 |
| | | | | |
| **Sub-Total 10b5-1 Sales** | | **(114,580)** | **Proceeds** | **$1,222,697** |
| | | | | |
| **Totals** | **Shares Purchased** | **0** | **Transaction Costs** | **$0** |
| | **Acquired By Options** | **+150,000** | **Transaction Costs** | **-$72,000** |
| | **Shares Sold** | **-114,580** | **Transaction Proceeds** | **$1,222,697** |
| | | **Net Gain to Defendant Lasater** | | **+$1,150,697** |

(c)      Defendant Hatton Class Period Sales

| Transaction Date | Higher One Purchases/ Sales | Shares | Price | Funds Spent / Gained |
|---|---|---|---|---|
| 08/10/2012 | Exercise of Option | 78,880 | $4.5900 | ($362,059) |
| 08/10/2012 | Sale | (78,880) | $11.6100 | $915,797 |
| 08/13/2012 | Exercise of Option | 93,777 | $4.5900 | ($430,436) |
| 08/13/2012 | Sale | (93,777) | $11.1700 | $1,047,489 |
| 08/15/2012 | Exercise of Option | 34,726 | $4.5900 | ($159,392) |
| 08/15/2012 | Sale | (34,726) | $11.0300 | $383,028 |
| 08/16/2012 | Exercise of Option | 72,374 | $4.5900 | ($332,197) |
| 08/16/2012 | Sale | (72,374) | $11.3200 | $819,274 |
| 08/20/2012 | Exercise of Option | 11,500 | $4.5900 | ($52,785) |
| 08/20/2012 | Sale | (11,500) | $11.3500 | $130,525 |
| 09/12/2012 | Exercise of Option | 75,000 | $0.2900 | ($21,750) |
| 09/12/2012 | Exercise of Option | 180,000 | $0.6700 | ($120,600) |
| 09/12/2012 | Exercise of Option | 75,000 | $1.3400 | ($100,500) |

| Date | Transaction | Shares | Price | Amount |
|---|---|---|---|---|
| 09/12/2012 | Exercise of Option | 58,749 | $2.6700 | ($156,860) |
| | | | | |
| **Sub-Total Options Exercised** | | **680,006** | **Cost** | **($1,736,579)** |
| **Sub-Total Option Shares Sold** | | **(291,257)** | **Proceeds** | **$3,296,112** |
| **Sub-Total Option Shares Retained** | | **388,749** | **Net Proceeds** | **$1,559,533** |
| | | | | |
| 09/10/2012 | Sale | (20,000) | $12.4400 | $248,800 |
| 09/10/2012 | Sale | (20,000) | $12.4400 | $248,800 |
| 09/10/2012 | Sale | (20,000) | $12.4500 | $249,000 |
| 09/11/2012 | Sale | (1,386) | $12.5500 | $17,394 |
| 09/11/2012 | Sale | (25,000) | $12.7000 | $317,500 |
| 09/11/2012 | Sale | (25,000) | $12.7000 | $317,500 |
| | | | | |
| **Sub-Total Non-10b5-1 Sales** | | **(111,386)** | **Proceeds** | **$1,398,994** |
| | | | | |
| 09/12/2012 | 10b5-1Sale | (25,000) | $12.8600 | $321,500 |
| 09/12/2012 | 10b5-1Sale | (25,000) | $12.8600 | $321,500 |
| 09/13/2012 | 10b5-1Sale | (40,000) | $12.3400 | $493,600 |
| 09/13/2012 | 10b5-1Sale | (40,000) | $12.3400 | $493,600 |
| 09/14/2012 | 10b5-1Sale | (15,000) | $12.6900 | $190,350 |
| 09/14/2012 | 10b5-1Sale | (58,345) | $12.6900 | $740,398 |
| 09/17/2012 | 10b5-1Sale | (65,083) | $12.8500 | $836,317 |
| 09/18/2012 | 10b5-1Sale | (38,000) | $13.1000 | $497,800 |
| 09/19/2012 | 10b5-1Sale | (35,641) | $13.1700 | $469,392 |
| 09/20/2012 | 10b5-1Sale | (90,000) | $13.1200 | $1,180,800 |
| 09/21/2012 | 10b5-1Sale | (48,961) | $13.2000 | $646,285 |
| | | | | |
| **Sub-Total 10b5-1 Sales** | | **(481,030)** | **Proceeds** | **$6,191,542** |
| | | | | |
| 12/26/2012 | Disposition (Gift) | (215,790) | n/a | n/a |
| | | | | |
| **Sub-Total Shares Gifted** | | **(215,790)** | n/a | n/a |

| Totals | Shares Purchased | 0 | Transaction Costs | $0 |
|---|---|---|---|---|
| | **Acquired By Options** | **+680,006** | **Transaction Costs** | **-$1,736,579** |
| | **Shares Gifted** | **-215,790** | **Transaction Costs** | **$0** |
| | **Shares Sold** | **-883,673** | **Transaction Proceeds** | **+$10,886,648** |
| | | | **Net Gain to Defendant Hatton** | **+$9,150,069** |

(d)    McGuane Insider Sales During Class Period

| Transaction Date | Higher One Purchases/ Sales | Shares | Price(s) | Funds Gained / Spent |
|---|---|---|---|---|
| 01/22/2013 | Exercise of Option | 10,500 | $0.5000 | ($5,250) |
| 01/22/2013 | 10b5-1 Sale | (10,500) | $11.4300 | $120,015 |
| 05/14/2013 | Exercise of Option | 100 | $0.5000 | ($50) |
| 05/14/2013 | 10b5-1 Sale | (100) | $11.0000 | $1,100 |
| 05/15/2013 | Exercise of Option | 31,400 | $0.5000 | ($15,700) |
| 05/15/2013 | 10b5-1 Sale | (31,400) | $11.0300 | $346,342 |
| 05/23/2013 | Exercise of Option | 10,500 | $0.5000 | ($5,250) |
| 05/23/2013 | 10b5-1 Sale | (10,500) | $11.0100 | $115,605 |
| 06/24/2013 | Exercise of Option | 10,500 | $0.5000 | ($5,250) |
| 06/24/2013 | 10b5-1 Sale | (10,500) | $11.0500 | $116,025 |
| 07/23/2013 | Exercise of Option | 900 | $0.5000 | ($450) |
| 07/23/2013 | 10b5-1 Sale | (900) | $11.0000 | $9,900 |
| 07/24/2013 | Exercise of Option | 1,303 | $0.5000 | ($652) |
| 07/24/2013 | 10b5-1 Sale | (1,303) | $11.0000 | $14,333 |
| 07/25/2013 | Exercise of Option | 5,756 | $0.5000 | ($2,878) |
| 07/25/2013 | 10b5-1 Sale | (5,756) | $11.0000 | $63,316 |
| 12/16/2013 | Exercise of Option | 60,041 | $0.5000 | ($30,021) |
| 12/16/2013 | 10b5-1 Sale | (60,041) | $10.0200 | $601,611 |
| | | | | |
| **Sub-Total Shares Acquired By Options** | | **131,000** | **Cost** | **($65,500)** |
| **Sub-Total 10b5-1 Sales** | | **(131,000)** | **Proceeds** | **$1,388,247** |

| | | | | |
|---|---|---|---|---|
| **Totals** | **Shares Purchased** | **0** | **Transaction Costs** | **$0** |
| | **Acquired By Options** | **+131,000** | **Transaction Costs** | **-$65,000** |
| | **Shares Sold** | **-131,000** | **Transaction Proceeds** | **+$1,388,347** |
| | | | **Net Gain to McGuane** | **+$1,322,747** |

(e)    Lightyear Insider Sales During the Class Period

| Transaction Date | Higher One Purchases/ Sales | Shares | Price(s) | Funds Gained / Spent |
|---|---|---|---|---|
| 10/08/2012 | 10b5-1Sale | (104) | $13.2600 | $1,379 |
| 10/08/2012 | 10b5-1Sale | (20,696) | $13.2600 | $274,429 |
| 10/09/2012 | 10b5-1Sale | (162) | $13.1900 | $2,137 |
| 10/09/2012 | 10b5-1Sale | (32,259) | $13.1900 | $425,496 |
| 10/10/2012 | 10b5-1Sale | (100) | $12.9700 | $1,297 |
| 10/10/2012 | 10b5-1Sale | (19,800) | $12.9700 | $256,806 |
| 10/11/2012 | 10b5-1Sale | (100) | $12.1300 | $1,213 |
| 10/11/2012 | 10b5-1Sale | (19,900) | $12.1300 | $241,387 |
| 10/12/2012 | 10b5-1Sale | (127) | $12.0900 | $1,535 |
| 10/12/2012 | 10b5-1Sale | (25,173) | $12.0900 | $304,342 |
| 10/15/2012 | 10b5-1Sale | (5) | $12.0200 | $60 |
| 10/15/2012 | 10b5-1Sale | (995) | $12.0200 | $11,960 |
| 10/19/2012 | 10b5-1Sale | (85) | $12.0000 | $1,020 |
| 10/19/2012 | 10b5-1Sale | (17,015) | $12.0000 | $204,180 |
| 10/22/2012 | 10b5-1Sale | (79) | $12.0400 | $951 |
| 10/22/2012 | 10b5-1Sale | (15,621) | $12.0400 | $188,077 |
| 10/23/2012 | 10b5-1Sale | (100) | $12.1100 | $1,211 |
| 10/23/2012 | 10b5-1Sale | (19,900) | $12.1100 | $240,989 |
| 10/24/2012 | 10b5-1Sale | (106) | $12.2500 | $1,299 |
| 10/24/2012 | 10b5-1Sale | (21,035) | $12.2500 | $257,679 |
| 10/25/2012 | 10b5-1Sale | (93) | $12.3100 | $1,145 |
| 10/25/2012 | 10b5-1Sale | (18,330) | $12.3100 | $225,642 |
| 10/26/2012 | 10b5-1Sale | (71) | $12.2800 | $872 |
| 10/26/2012 | 10b5-1Sale | (14,055) | $12.2800 | $172,595 |
| 10/31/2012 | 10b5-1Sale | (209) | $12.5800 | $2,629 |
| 10/31/2012 | 10b5-1Sale | (41,530) | $12.5800 | $522,447 |
| 11/01/2012 | 10b5-1Sale | (166) | $12.5800 | $2,088 |
| 11/01/2012 | 10b5-1Sale | (32,954) | $12.5800 | $414,561 |
| 11/02/2012 | 10b5-1Sale | (142) | $12.5800 | $1,786 |
| 11/02/2012 | 10b5-1 Sale | (28,256) | $12.5800 | $355,460 |
| 11/05/2012 | 10b5-1Sale | (95) | $12.4100 | $1,179 |
| 11/05/2012 | 10b5-1Sale | (18,992) | $12.4100 | $235,691 |
| 11/06/2012 | 10b5-1Sale | (160) | $12.1700 | $1,947 |
| 11/06/2012 | 10b5-1Sale | (31,754) | $12.1700 | $386,446 |
| | | | | |
| **Sub-Total 10b5-1 Sales** | | **(380,169)** | **Proceeds** | **$4,741,937** |

| 02/20/2013 | Disposition (Distributed to partners) | (4,975,000) | $0.0000 | $0 |
|---|---|---|---|---|
| 02/27/2013 | Disposition (Distributed to partners) | (472,551) | $0.0000 | $0 |
| | | | | |
| **Sub-Total Distributed to Partners** | | **(5,447,551)** | **Cost** | **$0** |
| | | | | |
| 05/23/2013 | Sale | (328) | $10.8700 | $3,565 |
| 05/23/2013 | Sale | (65,268) | $10.8700 | $709,463 |
| 05/24/2013 | Sale | (258) | $10.7600 | $2,776 |
| 05/24/2013 | Sale | (51,407) | $10.7600 | $553,139 |
| 05/28/2013 | Sale | (47) | $10.9500 | $515 |
| 05/28/2013 | Sale | (9,369) | $10.9500 | $102,591 |
| 05/29/2013 | Sale | (265) | $10.7500 | $2,849 |
| 05/29/2013 | Sale | (52,773) | $10.7500 | $567,310 |
| 05/30/2013 | Sale | (349) | $10.8400 | $3,783 |
| 05/30/2013 | Sale | (69,524) | $10.8400 | $753,640 |
| 05/31/2013 | Sale | (550) | $10.8900 | $5,990 |
| 05/31/2013 | Sale | (109,450) | $10.8900 | $1,191,911 |
| 06/03/2013 | Sale | (886) | $10.7900 | $9,560 |
| 06/03/2013 | Sale | (176,239) | $10.7900 | $1,901,619 |
| 06/04/2013 | Sale | (4,151) | $10.3500 | $42,963 |
| 06/04/2013 | Sale | (825,970) | $10.3500 | $8,548,790 |
| 09/05/2014 | Sale | (1,201) | $3.7200 | $4,468 |
| 09/05/2014 | Sale | (239,002) | $3.7200 | $889,087 |
| 09/08/2014 | Sale | (234) | $3.7100 | $868 |
| 09/08/2014 | Sale | (46,584) | $3.7100 | $172,827 |
| | | | | |
| **Sub-Total Non-10b5-1 Sales** | | **(1,653,855)** | **Proceeds** | **$15,467,712** |
| | | | | |
| **Totals** | **Shares Purchased** | **0** | **Transaction Costs** | **$0** |
| | **Shares Distributed** | **-5,447,551** | **Transaction Costs** | **$0** |
| | **Shares Sold** | **-2,034,024** | **Transaction Proceeds** | **+$20,209,649** |
| | | | **Net Gain to Insider Lightyear** | **+$20,209,649** |

(f)     Defendant McFadden Class Period Sales

| Transaction Date | Higher One Purchases/ Sales | Shares | Price(s) | Funds Gained / Spent |
|---|---|---|---|---|
| 02/22/2013 | Exercise of Option | 6,837 | $4.5900 | ($31,382) |
| 02/22/2013 | Sale | (6,837) | $10.0100 | $68,438 |
| 05/31/2013 | Exercise of Option | 60,000 | $4.5900 | ($275,400) |
| 05/31/2013 | Sale | (60,000) | $10.8600 | $651,600 |
| | | | | |
| Sub-Total Shares Acquired By Options | | 66,837 | Cost | ($306,782) |
| Sub-Total Non-10b5-1 Sales | | (66,837) | Proceeds | $720,038 |
| | | | | |
| Totals | Shares Purchased | 0 | Transaction Costs | $0 |
| | Acquired By Options | 66,837 | Transaction Costs | -$306,782 |
| | Shares Sold | 66,837 | Transaction Proceeds | +$720,038 |
| | | | Net Gain | +$413,257 |

164.     These robust sales during the Class Period, while the fraud was raging and the true facts of Higher One's business and operations as alleged herein remained hidden from investors, yielded Defendants Volchek, Lasater, Hatton, and McFadden a combined ***$12,606,068.00*** in net ill-gotten gains from Class Period sales at prices that were inflated by the fraud alleged herein.  When viewed in combination with the sales by McGuane and Lightyear, corporate insiders yielded a grand total of ***$34,138,464.00*** in net ill-gotten gains. These sales constitute exceedingly strong evidence of scienter.

## The Fraud Implicated Core Operations

165.     The fraud alleged herein implicates the core operations of Higher One.  The OneAccount, the fees charged on it and other consumer accounts, and the marketing of these accounts to consumers were at the very heart of Higher One's business and operations and,

according to its SEC filings and investor presentations during the Class Period, as well as the statements of the CWs, accounted for a considerable portion of its revenues, income, and projected growth.

166.    In light of these facts, it is inconceivable that Defendants, Higher One's executive management, and its Board did not know the facts and circumstances of the fraud as alleged herein.  Moreover, such knowledge is imputable to Defendants, given the implication of core operations, the Defendants' roles and status within Higher One, and the litany of facts regarding the funneling of information to them and their personal involvement in the key events and circumstances at issue, as alleged herein.

**The Fraud Involved Conduct Subject To A Prior Consent Order and Penalties**

167.    As alleged herein, the 2012 FDIC Consent Order made clear Higher One's prior misconduct and its considerable legal obligations, not only under the Consent Order itself, but also under applicable laws including §5 of the FTC Act.  Moreover, the 2012 FDIC Consent Order imposed significant monetary penalties and caused the termination of Higher One's relationship with one of its partner banks.  As a non-bank itself, Higher One was completely dependent upon such relationships with banks in order to offer consumers its OneAccount and other banking products.  Without them, Higher One had no business model.  The termination of such a relationship, and the correlating damage to Higher One's stature and reputational capital among similar banks and the education financing industry, were a significant negative outcome for Higher One.

168.    If Higher One's misconduct during the Class Period became known earlier, it faced significant monetary penalties, the loss of other bank relationships, and additional damage to Higher One's stature and reputational capital.  This reality provided Defendants with strong

motive to conceal their conduct and commit the fraud alleged herein, particularly as they were engaged in massive insider sales of Higher One stock.  Indeed, Defendants' actions to conceal the true reasons for the termination of the Cole Taylor partnership agreement, including that such termination had been initiated by Cole Taylor, provides exceedingly strong evidence of their motive, opportunity, and overall scienter.

169.    In light of these facts, as further alleged above, the fact that the fraud directly implicated some of the very same consumer products and misconduct as was at issue in the 2012 FDIC Consent Order and the Class Action Settlement and resulted in significant penalties before the Class Period is strong evidence supporting the inference of Defendants' scienter.

**Defendants Signed, Were Quoted In, Or SOX Certified The Alleged Misstatements**

170.    As the individuals who signed, were quoted in, or orally made the alleged false and misleading statements described herein, the Individual Defendants were under an obligation to familiarize themselves with the subject matter of those public statements and to speak truthfully.  As alleged herein, they violated such duties.

171.    As the individuals who SOX certified SEC filings as described above, Defendants Volchek, Wallace, and Wolf were obligated to inquire and investigate, familiarize themselves with the subject matter of their SOX certifications, and reassure themselves that the certifications were accurate and that they were speaking truthfully in making them.  As alleged herein, they violated such duties.

**Suspicious Executive Demotions, Resignations, and Departures Evidence Scienter**

172.    Another indicator of Defendants' scienter is the removal of key executives during or shortly after the Class Period.  Such demotions, resignations, and departures, which were highly suspect in timing (as evidenced by Appendix D submitted herewith), predominantly

occurred at the height of the alleged fraud, and strongly support the scienter inference, included the following:

(a)     In a May 7, 2013 8-K signed by Defendant Volchek, at the height of the fraud alleged herein, Higher One announced that Defendant Lasater – a company Co-Founder – was stepping down as COO, effective May 7, 2013, ostensibly to "focus his time and efforts on marketing and product innovation."

(b)     In a December 4, 2013 8-K ("12/4/2013 8-K") signed by Defendant Volchek, while the fraud alleged herein still raged undetected, Higher One announced that Defendants Volchek and Lasater, co-founders of Higher One, along with the Board, had "initiated a succession plan to bring the next level of senior leadership into the Company." It disclosed that the Board had formed a search committee and hired an executive recruiting firm to conduct a CEO search, so that Defendant Volchek could step down as CEO.

(c)     The 12/4/2013 8-K also disclosed that Defendant Lasater was stepping down as President, effective January 9, 2014, having notified Higher One of his intent to do so back on December 2, 2013. It said that he would remain as Chairman through the next annual meeting and would support key projects on a part-time basis. It also said that Defendant Lasater purportedly "for personal reasons decided to reduce his level of involvement in the day-to-day management of the company."

(d)     In a January 15, 2014 8-K (the "1/15/2014 8-K") signed by Defendant Volchek, Higher One announced that Defendant Lasater had entered into a new employment agreement on January 9, 2014, whereby he would be employed on a part-time basis and required to work just a minimum of four days per month, in exchange for which he received a base salary, eligibility for a performance bonus, and continued vesting of his outstanding equity awards.

(f)   The 1/15/2014 8-K also disclosed that Defendant Wolf had entered into a severance agreement with Higher One on January 14, 2014, which provided that in the event of his termination, he would be entitled to a severance of one year's salary plus prorated bonus if, within the ensuing 24 months, there was a change of control or Defendant Volchek was replaced as CEO.

(g)   In an April 16, 2014 8-K (the "4/16/2014 8-K") signed by Defendant Wolf, Higher One announced that Defendant Volchek had been replaced as CEO and that Defendant Volchek would remain a full-time employee of Higher One only through May 16, 2014 and thereafter become a part-time employee.

(h)   The 4/16/2014 8-K also announced that Defendant Hatton had resigned as a Director on April 11, 2014, effective April 16, 2014.  The only purported explanation given was that "Mr. Hatton's resignation is not due to a disagreement with the Company or any of its directors regarding the Company's operations, policies, or practices."

(i)   In an April 22, 2014 8-K (the "4/22/2014 8-K") signed by Defendant Wolf, Higher One announced that Lightyear's member of the Board of Directors, Stewart Gross, would not stand for reelection on the Board.  An accompanying press release (the "4/22/2014 Press Release") gave no explanation for the departure, stating only, "Stewart joined the Board in 2008 as part of Lightyear Capital's investment and has added significant value and insight."

(j)   In an October 10, 2014 8-K (the "10/10/2014 8-K") filed shortly after the Class Period ended, and even more closely after Higher One disclosed the massive scope of its potential liabilities to customers of both Federal Reserve- and FDIC-regulated partner banks, Higher One disclosed that Defendant Lasater's part-time employment would end, effective December 31, 2014.

173.   To sum up, at the height of the alleged fraud, during a period of frenzied insider sales, Higher One's two Co-Founders, one the CEO (Volchek) who pocketed over $1.8 million from insider sales and the other the COO/President (Lasater) who pocketed over $1.15 million, initiated a "succession plan" that, in stages, progressively removed themselves from Higher One to the point where they were working part-time, four hours a month, to permit the continued vesting of equity compensation.   Meanwhile, Higher One's former CEO (Hatton), who had resigned that role just prior to the Class Period, also resigned from the Board after pocketing over $9.1 million from insider sales, just as a significant insider (Lightyear) announced it would not seek reelection for its Board appointee after pocketing over $20.2 million.   At the same time, its CFO (Wolf) entered into a defensive severance agreement, providing him with a generous package if he were to be terminated within 24 months of a change of control or Volchek being replaced as CEO.   Defendants ensured protection for themselves and Higher One insiders, leaving Higher One's shareholders unprotected against the risks posed by their fraud.

## Defendants Tried To Conceal The Fraud

174.   As discussed *supra*, CW5, who wrote Higher One's banking policies and procedures during the Class Period, said that CW5's superiors instructed employees that banking rules and regulations did not apply to Higher One and said that Higher One failed to provide required training to employees, who were left to read updated policies on their own.   CW5 stated that, after the 2012 FDIC Consent Order, as Higher One was having trouble finding bank partners, CW5's title was changed from Compliance Assurance Procedures Analyst to Banking Oversight Assurance Analyst, and the explanation given by CW5's superior was that the change was made to prevent CW5 from talking to auditors investigating Higher One's banking relationships.   This is evidence of intentional efforts to conceal Defendants' fraud.

## The Fraud Violated Higher One's Corporate Code of Conduct

175.     Throughout the Class Period, Higher One had in place a Code of Business Conduct ("2010 Code of Business Conduct"), adopted June 17, 2010 and published on its corporate website.

176.     In a section captioned "Business Conduct and Contacts," the 2010 Code of Business Conduct set forth several pertinent obligations, including (emphasis original):

(a)      Earn Customer and Vendor Trust. The Company's reputation for integrity is tested every day by the way you treat the people with whom you do business. Honesty, fairness and keeping commitments must be hallmarks of the way you do business.

(b)      Present the Company Truthfully. Communications with the public should reinforce a sense of trust in the Company. Whether statements are channeled through customers, stockholders, the analyst community, trade groups, the mass media or made in private conversation, "honesty is the best policy." Public statements should be sufficiently candid, clear and complete so that they neither mislead nor lend themselves to misinterpretation.

The Company is also committed to full compliance with all requirements applicable to its public disclosures, including its reports filed or furnished to securities regulators. All of our business communications should be timely, clear and accurate. It is a violation of our policy to misrepresent our financial performance or otherwise compromise the integrity of our financial statements or other public disclosures.

All public statements relating to the Company or its business must first be reviewed and approved by the Company's Investor Relations Director.

177.     Also, in a section captioned "Compliance With Law," the 2010 Code of Business Conduct set forth additional requirements, as follows:

The Company strives to be an honorable company and employer. Our employees must always operate within the law in all business dealings. It is the Company's express policy that it and its employees obey all applicable U.S. federal, state, local and international laws and regulations.  Employees have a personal responsibility to become familiar and comply with the laws and regulations related to job responsibilities. There are also other laws – not directly related to an employee's job but of general relevance to work situations – of which you should

be aware. If you have any questions about what is within the law and what is not, seek advice from the General Counsel.

178.   The 2010 Code of Business Conduct specifically highlighted the U.S. securities laws as being among the "most important laws that apply to the Company, its employees and its business dealings."  It continued:

> Securities Laws. These laws forbid individuals and corporations from profiting from material non-public information, or "inside" information, that could influence decisions to buy, sell or hold onto particular securities. Such information may relate to the financial condition of a company, its products, the market for its securities, its investment intentions or plans for a merger, acquisition or divestiture. You may not make trades of securities based on material inside information or give such information to others.

179.   Higher One's Form 10-K filings during the Class Period, which contained a link to the 2010 Code of Business Conduct, stated, "We have adopted a written code of ethics, which we refer to as our Code of Business Conduct, that applies to directors, executive officers, and all employees of the Company, including our principal executive officer and principal financial officer.  The Code of Business Conduct is posted on our website at http://ir.higherone.com." This language made clear that, throughout the Class Period, the 2010 Code of Business Conduct governed the Individual Defendants' conduct at issue, which they knew and understood, inasmuch as they signed and SOX certified those Form 10-K filings.

180.   The fraud alleged clearly herein violated the 2010 Code of Business Conduct.

**The Fraud Risked A Default On Higher One's Credit Facility**

181.   On October 18, 2012, Higher One announced in a press release and a Form 8-K filed with the SEC that it had entered into a new five-year $200 million senior secured revolving credit facility (the "Credit Facility") to replace its prior $50 million revolving credit facility.  The Credit Facility agreement described various potential Events of Default and Remedies, including:

  <u>Judgments</u>.  There is entered against any Loan Party or any Subsidiary thereof (i) one or more final non-appealable judgments or orders for the payment of money in an aggregate amount (as to all such judgments and orders) exceeding $10,000,000.00 (to the extent not covered by independent third-party insurance as to which the insurer is rated at least "A" by A.M. Best Company, has been notified of the potential claim and does not dispute coverage), or (ii) any one or more non-monetary final judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon such judgment or order, or (B) there is a period of thirty (30) consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, is not in effect.

It elsewhere defined "Material Adverse Effect" as, among other things, "a material adverse change in, or a material adverse effect upon, the operations, business, properties, liabilities (actual or contingent), condition (financial or otherwise) or prospects of" Higher One. Moreover, in the Credit Facility agreement, Higher One covenanted and agreed that it and its subsidiaries would "[c]omply with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property…."

  182. Thus, Higher One risked defaulting on the Credit Facility and/or violating the terms of the Credit Facility agreement due to the fraud alleged herein, which exposed it to significant risk of an adverse judgment exceeding $10 million.  The terms of the Credit Facility were in effect and binding on Higher One throughout the portion of the Class Period that post-dated its execution and were known to all Defendants.  During the Class Period, as Defendants knew, Higher One's outstanding balance under the Credit Facility ranged between $63 million and $112 million, as reported in its SEC filings.  Therefore, Defendants understood that any potential default was a serious, existential risk for Higher One.

### NO SAFE HARBOR

  183. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

Most, if not all, of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent any statements were labelled as forward-looking, they included statements of then-historical or then-present fact and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Any purported cautionary language warned only of theoretical future risks at times when those risks had already ripened due to Higher One's then-ongoing misconduct.  Moreover, the purported cautionary language failed to adjust over time, using the same theoretical tone even after concrete changes of circumstance.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Higher One who knew that those statements were false when made.

184.    For all these same reasons, the bespeaks caution doctrine likewise does not apply to shield Defendants from liability.

## **THE CLAIMS ARE TIMELY**

185.    The claims set forth herein were timely filed.

186.    The market was not arguably aware until May 2014, at the earliest, that credible allegations existed to the effect that Higher One misrepresented and failed to disclose that its business practices during the Class Period had violated the Federal Trade Commission Act.

187.    It was also not until May 2014 that Plaintiffs were first presented with any credible evidence that Defendants had made materially false and misleading statements to investors during the Class Period.  In the absence of publicly available information prior to then

suggesting that Higher One's pronouncements in its SEC filings and other public statements during the Class Period were materially false and/or misleading, Plaintiffs were not under any duty to inquire as to the truthfulness of Higher One's public statements. Therefore, Plaintiff's duty in that regard arose no earlier than May 2014.

188.    Prior to May 2014, Plaintiff and Class Members could not have been on any inquiry notice of possible claims under the Securities Exchange Act. Even assuming this early date for inquiry notice, Plaintiffs' Securities Exchange Act claims against Defendants were brought within two years. Therefore, Plaintiffs have complied with the requirements of 28 U.S.C. § 1658(b).

## LOSS CAUSATION/ECONOMIC LOSS

189.    The market for Higher One shares was open, well-developed, and efficient at all relevant times. During the Class Period, as detailed herein, Defendants engaged in a course of conduct and a scheme to deceive the market that artificially inflated Higher One shares and operated as a fraud or deceit on Class Period purchasers of Higher One shares by misrepresenting the material facts detailed herein. As detailed above, at the end of the Class Period, when Defendants' prior misrepresentations became known to the public, the price of Higher One shares fell precipitously, as the prior artificial inflation came out. As a result of their purchases of Higher One shares during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

190.    During the Class Period, Defendants presented a misleading picture of Higher One's financial condition, revenues, growth, performance, and business prospects. Defendants' false and misleading statements had the intended effect and caused Higher One shares to trade at

artificially inflated prices throughout the Class Period and until the truth was revealed to the market.

191.    In response to the issuance of corrective reports in May 2014, the price of Higher One shares sharply dropped, on high volume, as detailed herein.  These drops, among others, removed inflation from the price of Higher One shares, causing real economic loss to investors who had purchased Higher One shares during the Class Period.

192.    The decline was a direct and proximate result of the nature and extent of Defendants' fraud being revealed to investors and the market.  The timing and magnitude of the price decline in Higher One shares negates any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic factors or Company-specific facts unrelated to Defendants' fraudulent conduct.

193.    The economic loss, *i.e.*, damages, suffered by Plaintiffs and other Class members was a direct and proximate result of Defendants' fraudulent scheme to artificially inflate Higher One share price and the subsequent significant decline in the value of Higher One shares when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## PRESUMPTION OF RELIANCE

194.    At all relevant times, the market for Higher One shares was an efficient market, supporting a presumption of reliance under the fraud-on-the-market doctrine, for the following reasons, among others:

a.    Higher One met the requirements for listing, and was listed and actively traded on the NYSE under ticker symbol "ONE", a highly efficient and automated market;

b.    Higher One had approximately 47.558 million shares outstanding as of May 12, 2014, such that its stock was liquid.  During the Class Period, numerous shares

of Higher One stock were traded on a daily basis, with moderate to heavy volume, demonstrating an active and broad market for Higher One stock and permitting a strong presumption of an efficient market;

(c)     As a regulated issuer, Higher One filed periodic public reports with the SEC;

(d)     Higher One regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e)     Higher One was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period; and

(f)     Unexpected material news about Higher One was rapidly reflected and incorporated into Higher One's stock price during the Class Period.

195.    As a result of the foregoing, the market for Higher One common stock promptly digested current information regarding Higher One from all publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all purchasers of Higher One stock during the Class Period suffered similar injury through their purchase of Higher One stock at artificially inflated prices and a presumption of reliance applies.

196.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material

information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

197.    Plaintiffs bring this federal securities action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of a class (the "Class") of all persons and entities who purchased Higher One Holdings, Inc. (NYSE: ONE) securities from August 7, 2012 to August 6, 2014, inclusive (the "Class Period") and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of Higher One at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

198.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Higher One securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Higher One or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

199.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

200.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

201.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Higher One;

- whether the Individual Defendants caused Higher One to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Higher One securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and,

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

202.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

203.     As alleged herein, Plaintiffs will rely, in part, on the presumption of reliance established by the fraud-on-the-market doctrine, inasmuch as Defendants made public

111

misrepresentations or failed to disclose material facts during the Class Period; the misrepresentations and omissions were material and would tend to induce a reasonable investor to misjudge the value of Higher One's securities; and Plaintiffs and members of the Class purchased or otherwise acquired Higher One securities between the time the Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

## COUNT I

### (Against All Defendants For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder)

204. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

205. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

206. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Higher One securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Higher One securities and options at artificially inflated prices. In furtherance

of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

207.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other documents and statements described above, including statements made to securities analysts and the media that were designed to influence the market for Higher One securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Higher One's operations, finances and business prospects.

208.    Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein, including by virtue of their positions at Higher One, and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

209.    Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Higher One securities.

210.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  Defendants' first-hand

knowledge, including as to the facts and circumstances surrounding Cole Taylor's termination of its banking relationship with Higher One, are alleged herein.  Moreover, as the senior managers and/or directors of Higher One, the Individual Defendants had knowledge of the details of Higher One's operations, business, and internal affairs.

211.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Higher One.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Higher One's businesses, operations, financial condition and prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Higher One securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Higher One's business, operations and financial condition concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Higher One securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

212.    During the Class Period, Higher One securities were traded on an active and efficient market.  Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Higher One securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or

otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Higher One securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class.  The market price of Higher One securities declined sharply upon public disclosure of the fraud alleged herein, to the injury of Plaintiffs and Class members.

213.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

214.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of Higher One's securities during the Class Period, upon the disclosure that Higher One had been disseminating materially misstatements and omissions to the investing public.

## COUNT II

### (Violations of Section 20(a) of the
Exchange Act Against The Individual Defendants)

215.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

216.    During the Class Period, the Individual Defendants participated in the operation and management of Higher One, and conducted and participated, directly and indirectly, in the conduct of Higher One's business affairs.  Because of their senior positions, they knew the adverse non-public information about Higher One's business, operations, finances, and prospects, including the status of its relationship with banking partners such as Cole Taylor.

217.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Higher One's business, operations, financial condition, results of operations, and prospects and to correct promptly any public statements issued by Higher One which had become materially false or misleading.

218.    Because of their positions of control and authority as senior officers and directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Higher One disseminated in the marketplace during the Class Period concerning Higher One's business, operations, financial condition, results of operations, and prospects.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Higher One to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Higher One within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Higher One securities.

219.    Each of the Individual Defendants, therefore, acted as a controlling person of Higher One.  By reason of their senior management positions and/or being directors of Higher One, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Higher One to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations and business of Higher One and possessed the power to control the specific activities that comprise the primary violations about which Plaintiffs and the other members of the Class complain.

220.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Higher One.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.      Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated:   December 2,  2016

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Matthew L. Tuccillo*
Matthew L. Tuccillo
Jeremy A. Lieberman
Jennifer Banner Sobers
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184

*Plaintiffs' Lead Counsel*

117

**GOLDMAN GRUDER & WOODS, LLC**
Henry Elstein
Bruce L. Elstein
105 Technology Dr., Suite 2A
Trumbull CT 06611
Telephone: (203) 880-5333
Facsimile: (203) 880-3332

***Plaintiffs' Liaison Counsel***